UNITED STATES v. DOMESTIC FUEL CORPORATION et al.
Customs Appeal No. 3727.

Court of Customs and Patent Appeals.
April 2, 1934.

Charles D. Lawrence, Asst. Atty. Gen., and John T. Fowler, Sp. Asst. to Atty. Gen. (Ralph Folks, Sp. Atty., of New York City, of counsel), for the United States.

Curtis, Fosdick & Belknap, of New York City (James F. Curtis, of New York City, of counsel), for appellees.

Henry Warrum, of Indianapolis, Ind., Gleason, MacLanahan, Merritt & Ingraham, of New York City, and Geo. W. Dalzell, of Washington, D. C. (Walter Gordon Merritt, George C. Austin, and Cyrus C. Perry, all of New York City, of counsel), amici curiæ.

Before GRAHAM, Presiding Judge, and BLAND, HATFIELD, GARRETT, and LENROOT, Associate Judges.

GARRETT, Associate Judge.

Appeals are here brought before us from two judgments of the United States Customs Court, sustaining protests made by Domestic Fuel Corporation and George E. Warren Corporation, respectively, against the assessment and collection by collectors of customs of taxes or duties on certain importations of anthracite coal, made in the year 1932, from Germany and from Wales, a part of the United Kingdom of Great Britain and Ireland, respectively.

By agreement of counsel, with the approval of the court, a consolidated record was prepared for the appeals and the cases were briefed and orally argued together. The trial court disposed of both cases in a single opinion, rendering separate judgments, and that course will be followed by us.

By section 201, paragraph 1650 of the Tariff Act of 1930 (19 USCA § 1201, par. 1650) coal is placed on the free list, with, however, a countervailing duty proviso not here involved.[1]

The Revenue Act of 1932 provides in the main for internal taxes as distinguished from duties on imports, but title 4 thereof, which provides for certain "Manufacturers' excise taxes," carries also provision for the imposition and collection, by collectors of customs, of taxes, or duties on quite a number of specifically designated articles, upon their importation, the tax to be imposed, as set forth in the act, "unless treaty provisions of the United States otherwise provide."

Among the articles so designated is coal, such as that here involved, the tax to be levied thereon at the rate of 10 cents per 100 pounds, but the coal paragraph has a provision, not appearing in any of the other tariff paragraphs, the meaning of which is that the tax provided shall not be imposed upon coal and other fuel materials named in the paragraph, imported from countries with which, during the calendar year preceding the importation, the balance of trade in such coal and other fuel materials was favorable to the United States.[2]

It is agreed that during the calendar year

---

[1] The paragraph which appears in "Title II—Free List" of the Tariff Act of 1930 reads:

"Par. 1650. Coal, anthracite, semianthracite, bituminous, semibituminous, culm, slack, and shale; coke; compositions used for fuel in which coal or coal dust is the component material of chief value, whether in briquets or other form: Provided, That if any country, dependency, province, or other subdivision of government imposes a duty on any article specified in this paragraph, when imported from the United States, an equal duty shall be imposed upon such article coming into the United States from such country, dependency, province, or other subdivision of government."

[2] "Sec. 601. Excise Taxes on Certain Articles

"(a) In addition to any other tax or duty imposed by law, there shall be imposed a tax as provided in subsection (c) on every article imported into the United States unless treaty provisions of the United States otherwise provide.

"(b) The tax imposed under subsection (a) shall be levied, assessed, collected, and paid in the same manner as a duty imposed by the Tariff Act of 1930, and shall be treated for the purposes of all provisions of law relating to the customs revenue as a duty imposed by such Act, except that — * * *

"(c) There is hereby imposed upon the following articles sold in the United States by the manufacturer or producer, or imported into the United States, a tax at the rates hereinafter set forth, to be paid by the manufacturer, producer, or importer: * * *

"(5) Coal of all sizes, grades, and classifications (except culm and duff), coke manufactured therefrom; and coal or coke briquettes, 10 cents per 100 pounds. The tax on the articles described in this paragraph shall apply only with respect to the importation of such articles, and shall not be imposed upon any such article if during the preceding calendar year the exports of the articles described in this paragraph from the United States to the country from

1931 the balance of trade in anthracite coal between the United States and Mexico and between the United States and Canada was favorable to the United States, and that, during the calendar year 1932, under instructions of the Treasury Department, anthracite coal imported into the United States from both Mexico and Canada was admitted without the levying of tax or duty thereon.

It is further agreed that, during the calendar year 1931, the balance of trade in coal, such as that involved, between the United States and Germany, and between the United States and the United Kingdom of Great Britain and Ireland, was against the United States. .

The effective date of section 601 of the Revenue Act of 1932 was 15 days after June 6, 1932, the date of its approval by the President of the United States, and T. D. 45751, instructing collectors of customs to admit coal from Mexico and Canada (these countries being specifically named) tax free, was issued June 20, 1932.[3]

From T. D. 46102, hereinafter alluded to, we learn that on July 26, 1932, "the Bureau of Customs advised an inquirer that coke from Great Britain, Belgium, or Germany, imported into the United States during 1932 after the effective date of the revenue act would be subject to the import tax provided for in the said act." It does not appear from the record who the inquirer was, but it does seem to have become the administrative practice thereafter for collectors to assess and collect duties upon coal coming from those countries, which practice was followed in the instant cases.

The record before us does disclose that, under date of July 26, 1932, the Assistant Secretary of State of the United States addressed a communication to the Secretary of the Treasury on the subject of the applicability of the tax on coal, provided in the Revenue Act of 1932, to importations from Germany and Great Britain in view of the provisions of the "most-favored-nation" clauses in the commercial treaties existing between the United States and those countries, taken in connection with the clause, "unless treaty provisions of the United States otherwise provide" contained in the act.

To this communication the Secretary of the Treasury responded by letter, dated November 14, 1932, and expressed the opinion that "so long as coal from Canada or any other country is exempt from the tax prescribed in section 601 (c) (5) of the revenue act, coal from Great Britain or Germany is entitled to similar treatment when imported into this country."

On November 19, 1932, T. D. 45991 was formally issued, paragraph 6 of which instructed collectors of customs, according to the views expressed in the said letter of the Secretary of the Treasury.[4]

Subsequently, on January 9, 1933, there was issued T. D. 46102, which revoked T. D. 45991—6, and directed the assessment of the tax upon coal, coke, and other fuels imported "from countries to which the exports from the United States did not exceed the imports therefrom of such fuels during the calendar year preceding the date of importation."[5]

The importations here at issue seem to

---

which such article is imported have been greater in quantity than the imports into the United States from such country of the articles described in this paragraph." 47 Stat. 259 (26 USCA § 3601 note).

3 The pertinent portion of T. D. 45751 reads as follows:

"As the total exports of coal, coke, and briquettes described in section 601 (c) (5) from the United States to Canada exceeded the total imports of the same commodities from that country to the United States during the calendar year 1931, and the total exports of such commodities from the United States to Mexico exceeded the total imports from that country during the same period, no tax shall be collected during the calendar year 1932 on such articles imported into the United States from Canada or Mexico."

4 Paragraph 6 of T. D. 45991 reads:
"(6) Revenue act of 1932—Coal.—In

view of the provisions in the treaties between the United States, and Great Britain and Germany, respectively, and of the express provision made by the Congress in section 601 (a) of the revenue act of 1932 for an exception from the application of the taxes thereby imposed in cases where treaty provisions of the United States otherwise provide, held that, so long as coal from Canada or any other country is exempt from the tax prescribed in section 601 (c) (5) of the revenue act, coal from Great Britain or Germany is entitled to similar treatment when imported into this country. Bureau letter dated November 14, 1932. (110409.)"

5 T. D. 46102:
"Treasury Department, January 9, 1933.
"To Collectors of Customs and Others Concerned:
"Reference is made to T. D. 45991—6, an abstract of a department ruling of No-

have been entered and liquidated prior to the date of the letter of the Secretary of the Treasury above alluded to, and, as of course, prior to T. D. 45991—6, supra, based upon said letter.

Timely protests were filed by the importers in both of the cases before us. These protests, as finally amended, of necessity differ in certain particulars, but the essential contention of each protest is that the levying of the tax is in contravention or violation of the most-favored nation clauses of treaties existing respectively between the United States and Germany[6] and the United States and

vember 14, 1932, that, by reason of the most-favored-nation treaties between the United States and Great Britain and Germany, respectively, and the terms of section 601 (a) of the revenue act of 1932, coal imported from the two countries last named is not subject to the import tax provided for in section 601 (c) (5) of the revenue act, so long as coal from Canada or other countries is admitted free of such tax.

"The department held in T. D. 45751 of June 20, 1932, that coal, coke, and briquets imported from Canada during the year 1932 would not be subject to the import tax, and in a letter of July 26, 1932, the Bureau of Customs advised an inquirer that coke from Great Britain, Belgium, or Germany, imported into the United States during 1932 after the effective date of the revenue act would be subject to the import tax provided for in the said act. In determining the taxable status of the fuels in each of these instances consideration was given only to the balance of trade in such fuels between the United States and each of the other countries.

"In a letter addressed to the President on December 27, 1932, the Attorney General expressed his opinion that the ruling of November 14 above mentioned reversed adversely to the United States the prior rulings of the department mentioned in the preceding paragraph, which he viewed as giving a construction to so much of section 601 of the revenue act of 1932 as relates to the import tax provided for certain kinds of coal, coke, and briquets.

"Inasmuch as the department's ruling of November 14 was made without the concurrence of the Attorney General, that officer holds that it is contrary to the provisions of section 502 (b) of the tariff act of 1930 and inoperative. He states further that in his opinion the question involved in the ruling is one which is bound to become immediately the subject of judicial inquiry, regardless of what opinion he might render with respect to it, and he therefore holds that it is not proper for him to express any opinion as to the effect of treaty provisions on the taxable status of the imported fuels, and that the tax should continue to be assessed in order that this question may be judicially determined on protest and litigation by the importers.

"In view of the foregoing opinion of the Attorney General, T. D. 45991—6 is hereby revoked. Collectors of customs shall accordingly proceed with the assessment of the import tax of 10 cents per 100 pounds on all entries covering importations after June 20, 1932, of coal of all sizes, grades, and classifications (except culm and duff), coke manufactured therefrom, or coal or coke briquets from countries to which the exports from the United States did not exceed the imports therefrom of such fuels during the calendar year preceding the date of importation. Importers dissatisfied with such assessment of duty may avail themselves of their statutory right of protest, as provided in section 514 of the tariff act. The Attorney General states that his department will offer every facility to the importers to enable them to obtain a speedy judicial decision of the questions involved.

"(110409.)

"Ogden L. Mills,
"Secretary of the Treasury."

6 The treaty with Germany (vide 44 Stat. 2132, 2137) was proclaimed October 14, 1925. The portions of same here pertinent are found in article 7 thereof, reading:

"* * * Each of the High Contracting Parties binds itself unconditionally to impose no higher or other duties or conditions and no prohibition on the importation of any article, the growth, produce or manufacture, of the territories of the other than are or shall be imposed on the importation of any like article, the growth, produce or manufacture of any other foreign country. * * *

"Any advantage of whatsoever kind which either High Contracting Party may extend to any article, the growth, produce, or manufacture of any other foreign country shall simultaneously and unconditionally, without request and without compensation, be extended to the like article the growth, produce or manufacture of the other High Contracting Party. * * *

"With respect to the amount and collection of duties on imports and exports of every kind, each of the two High Contracting Parties binds itself to give to the nationals, vessels and goods of the other the advantage of every favor, privilege or immunity which it shall have accorded to the nationals, vessels and goods of a third State, and regardless of whether such fa-

Great Britain,[7] which treaties are claimed not to have been repealed, abrogated, or modified, but to have been explicitly recognized by the heretofore quoted clause of section 601 (a), "unless treaty provisions of the United States otherwise provide."

As we view the issues before us there is no occasion here for an elaborate or detailed consideration and discussion of the place of treaties in the law of the land. Neither is there any requirement of elaborate or detailed discussion of the power of Congress to supersede treaties by legislation enacted subsequent to the ratification and promulgation of such treaties. Article 6 of the Constitution declares " * * * all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land," and the courts have had frequent occasion to construe and apply the provision thus made. The general principle is so well established as to require no citations, other than those hereinafter named relating to specific phases of the controversies before us. The same may be said of the general principle relative to the abrogation or repeal of treaties by subsequent legislation. "Where a treaty and an act of Congress are in conflict, the latest in date must prevail," is a well-established and often-declared rule. United States v. Lee Yen Tai, 185 U. S. 213, 22 S. Ct. 629, 46 L. Ed. 878, and cases therein cited.

Appellees, however, do not here question the power or authority of Congress to supersede treaties. Their contention proceeds, in effect, upon the theory that Congress has not abrogated the treaties here involved and that,

by the provisions of the treaties—they being substantive law—coal from Germany and England, imported in 1932, was entitled to the same treatment relative to taxation as coal, imported that year, from Canada and Mexico.

In brief, appellees do not bring the law itself in question except as to its construction. Their protests are leveled at administrative acts of the respective collectors of customs as being in contravention of the law, when such law is properly construed and applied.

The issue being thus limited, we deem it entirely proper to refrain from any discussion of a number of incidental or collateral questions suggested by some of the briefs filed in the case, interesting as those questions may be.

It is contended on behalf of appellant that the taxes levied are not, in a legal sense, discriminatory, and that their levy does not contravene the most-favored nation clauses of the treaties.

The expression "in a legal sense," used immediately above, is our own, it being our interpretation of the meaning of this portion of appellant's argument.

We are wholly unable to conclude, that there was not, so far as the involved importations were concerned, discrimination in fact.

Coal from Canada and Mexico was admitted duty free in 1932 because in the calendar year 1931, which was a passed period at the time of the enactment of the Revenue Act of 1932 (26 USCA § 3001 et seq.), the balance of trade in coal between the United

vored State shall have been accorded such treatment gratuitously or in return for reciprocal compensatory treatment. Every such favor, privilege or immunity which shall hereafter be granted the nationals, vessels or goods of a third State shall simultaneously and unconditionally, without request and without compensation, be extended to the other High Contracting Party, for the benefit of itself, its nationals and vessels."

[7] The treaty with Great Britain (vide 8 Stat. 228, 7 Fed. Stat. Ann. 575) was proclaimed December 22, 1815. The portion of same here pertinent is found in article 2, reading:

"Art. 2. No higher or other duties shall be imposed on the importation into the United States of any articles, the growth, produce, or manufacture, of his Britannick majesty's territories in Europe, and no higher or other duties shall be imposed on the importation into the territories of his

Britannick majesty in Europe of any articles, the growth, produce, or manufacture, of the United States, than are or shall be payable on the like articles being the growth, produce, or manufacture, of any other foreign country; nor shall any higher or other duties or charges be imposed in either of the two countries, on the exportation of any articles to the United States, or to his Britannick majesty's territories in Europe, respectively, than such as are payable on the exportation of the like articles to any other foreign country; nor shall any prohibition be imposed on the exportation or importation of any articles, the growth, produce, or manufacture, of the United States, or of his Britannick majesty's territories in Europe, to or from the said territories of his Britannick majesty in Europe, or to or from the said United States, which shall not equally extend to all other nations."

States and those respective countries was favorable to the United States. In that same year of 1932 the coal here at issue was taxed because the balance of trade in coal with Germany and Great Britain was, in 1931, adverse to the United States.

The respective treatments accorded the importations from Mexico and Canada, upon the one hand, and Germany and Great Britain upon the other, resulted solely from the application of a commercial criterion—balance of trade—fixed in the paragraph. That trade condition had become history before the Revenue Act of 1932 had become law. It was impossible for any one of the nations involved to alter a fact or condition of that nature, and the trial court has well expressed the situation in its statement that " * * * the effect is the same as though it [the Revenue Act of 1932] had stated that coal from Germany and Great Britain shall be taxed until the balance of trade shifts."

This fact, as a fact, is inescapable, but this does not necessarily determine, without more, the matter of discrimination in a legal sense.

To determine that question we must look, first, to the treaties themselves, assuming, for the time being, that they have not been abrogated or superseded, and, second, to the statute.

Obviously, there is nothing in the text of the most-favored nation clauses of either treaty which relates to or considers balance of trade conditions between the United States and other countries. From the texts themselves, therefore, we derive no suggestion that such condition was within the contemplation of the high contracting parties as an element which might affect the tariff duties levied by such parties, with results of the nature of those here before us.

It is, however, argued on behalf of appellant that, if the words of the statute are given their ordinary and obvious meanings, British and German coal are clearly taxable. The gist of appellant's argument upon this point seems to be expressed in the following excerpt from the brief: "Appellee necessarily contends that the British and German treaties are violated, not by the tax on coal, but by the provision that the tax shall not be collected if trade balances are favorable to the United States. Even assuming that this exemption from the tax has the effect of violating the British or German treaty, this does not affect the interpretation of the statute. The statute says that *the tax* is not to be collected if treaties otherwise provide;

it does not say that *the exemption* from the tax shall not be applied if treaties otherwise provide. Assuming that the provision concerning the exemption from the tax, as well as the tax itself, is subject to the restriction, 'unless treaty provisions of the United States otherwise provide,' this might deny the benefit of such exemption to Canada and Mexico but could not avail to remove the duty from British and German coal." (Italics quoted.)

We are unable to agree to the soundness of the foregoing contention, nor do we understand that appellees acquiesce in the statement of their position made therein. Indeed, they expressly reject it. If we comprehend aright, the implication in the latter portion of the statement is to the effect that the phrase "unless treaty provisions of the United States otherwise provide" might have rendered it legal to assess duties upon coal imported in 1932 from Mexico and Canada. In this implication we cannot acquiesce.

The statute itself is very plain in providing that the tax shall not be levied upon coal imported from countries with which the balance of trade was favorable to the United States during the calendar year preceding the importation. There is no ambiguity in the language respecting this. Mexico and Canada were in this exempted class, and certainly we have no treaties with these countries which render coal coming therefrom taxable, despite the statute expressly exempting it.

Had the administrative officials levied duties upon coal coming, in 1932, from Mexico and Canada, and proper protests had been filed by the importers, it is not seen how such duties could have been sustained upon the theory that most-favored nation clauses in treaties with other countries required such levy in order to avoid a breach of such treaties.

It is further argued on behalf of appellant that the duties provided under section 601 (c) (5) are based on a class or group principle of long standing, and that such duties are not discriminatory, because:

"1. Coal from a class or group of nations having a favorable trade balance in coal is dutiable.

"2. Coal from a class or group of nations having an unfavorable trade balance in coal is not dutiable."

The trial court correctly states the principle that "it is a general rule of law that a taxing statute which operates uniformly upon any class or group is not discriminatory."

But, as that court subsequently points out, in effect, this general rule must be tested in regard to its applicability here by the treaty provisions themselves. Unless the treaties were abrogated or modified, the courts must consider their language as well as the language of the statute, and must construe the two—both being the law of the land—together.

It seems to us that the statement of facts 1 and 2 quoted, supra, from the brief in behalf of appellant, itself refutes the argument of nondiscrimination based upon those facts.

The brief on behalf of appellant quotes, as does the opinion of the trial court, from a report of a committee of experts of the League of Nations, an excerpt from a part stated to have been prepared by Hon. George W. Wickersham, former Attorney General of the United States, and a recognized authority upon international law, as follows: "The rule of uniformity is an abstraction or generalization from the rule announcing the purpose of the most-favoured nation clause. The most-favoured nation clause is to be considered as an entity, according to this rule, and its purpose is to prevent discrimination. If there is no discrimination, there is no violation of the rule. If the provision applies equally to all nations, there is no discrimination. Therefore, if the terms of the provision complained of are applicable to all nations equally, there is no violation of the clause, even though it is certain that only a few nations will be able to meet the requirements. In other words, it is similar to the American contention that the clause secures equality of opportunity, and not equality of treatment." Amer. Jour. Int. Law, Spec. Supp., vol. 22, 1928, p. 146.

The appellant insists, contrary to the construction of the foregoing by the trial court, that appellant's position here is in harmony therewith.

It does not so appear to us. How can it be said that a provision according different treatments to importations of coal, based upon a condition incapable of being altered, "applies equally to all nations," or "secures equality of opportunity"?

There are cited, in briefs filed in support of the contentions for appellant respecting the discrimination phase of the pending controversies, a number of cases decided by this court wherein questions relating to countervailing duties were involved. Sonneborn Sons v. United States, 1 Cust. App. 443, T. D. 31504; United States v. Franklin Sugar Refining Co., 2 Cust. App. 116, T. D. 31659;

Sonneborn's Sons v. United States, 3 Cust. App. 54, T. D. 32348; Nicholas & Co. et al. v. United States (Shaw & Co. et al. v. United States), 7 Cust. App. 97, T. D. 36426; Balfour, Guthrie & Co. v. United States, 11 Cust. App. 266, T. D. 39081.

Also there are cited decisions of the Supreme Court of the United States respecting certain phases of our internal tax laws. Brushaber v. Union Pacific Railroad Co., 240 U. S. 1, 36 S. Ct. 236, 60 L. Ed. 493, L. R. A. 1917D, 414, Ann. Cas. 1917B, 713; Scholey v. Rew, 23 Wall. (90 U. S.) 331, 23 L. Ed. 99; Knowlton v. Moore, 178 U. S. 41, 20 S. Ct. 747, 44 L. Ed. 969, and others.

We do not find in these cases, nor in cases such as Bartram v. Robertson, 122 U. S. 116, 7 S. Ct. 1115, 30 L. Ed. 1118, Whitney v. Robertson, 124 U. S. 190, 8 S. Ct. 456, 31 L. Ed. 386, Kelly v. Hedden, 124 U. S. 196, 8 S. Ct. 459, 31 L. Ed. 389, and others, relating to issues arising out of reciprocity treaties, any principle which seems apposite upon the discriminatory phases of the instant cases.

Instances are cited in the briefs and in the opinion of the United States Customs Court, where questions, mostly dealt with through diplomatic channels, have arisen in the past under the most-favored nation clauses of different treaties. We do not deem it important to say more upon these than was well said in the trial court's opinion. No question directly analogous to the instant one was involved in any of those cases.

It is our opinion that the duty assessments here complained of were in conflict with the respective treaty provisions involved, and that, unless the Revenue Act of 1932 repealed such treaty provisions, the collection of such duties was an illegal exaction. There is a distinction between the German and British treaties to which allusion later will be made.

This brings us to the question: Did the Revenue Act of 1932 abrogate, modify, or repeal the treaties here invoked?

The making of treaties is a function with which the courts have no official concern, that being an exercise of political power committed to the executive branch of the government acting in co-operation with the legislative branch to the extent defined and required in the Constitution. The concern of courts respecting them involves, as of course, questions as to their existence and, if they do exist, questions affecting their construction as the law of the land. Foster v. Neilson, 27 U. S. (2 Pet.) 253, 7 L. Ed. 415; American

Express Co. et al. v. United States, 4 Cust. App. 146, T. D. 33434.

In Wood v. United States, 41 U. S. (16 Pet.) 342, 363, 10 L. Ed. 987, Mr. Justice Story, speaking for the Supreme Court of the United States upon a question of the repeal of a statute (not in any way involving a treaty) by implication, said: " * * * There must be a positive repugnancy between the provisions of the new law, and those of the old; and even then, the old law is repealed by implication, only pro tanto, to the extent of the repugnancy."

That repeal by implication of any statute is not favored has been a rule uniformly announced and followed by the Supreme Court of the United States in cases involving such issue throughout its entire history. Harford v. United States, 12 U. S. (8 Cranch) 109, 3 L. Ed. 504; State of South Carolina v. Stoll, 84 U. S. (17 Wall.) 425, 430, 21 L. Ed. 650; Arthur v. Homer, 96 U. S. 137, 140, 24 L. Ed. 811; In re Crow Dog, 109 U. S. 556, 570, 3 S. Ct. 396, 27 L. Ed. 1030.

The courts, too, have uniformly intimated an even stronger disposition to apply this rule in cases where treaties are involved. Thus in Chew Heong v. United States, 112 U. S. 536, 540, 5 S. Ct. 255, 256, 28 L. Ed. 770, it was said: " * * * Aside from the duty imposed by the constitution to respect treaty stipulations when they become the subject of judicial proceedings, the court cannot be unmindful of the fact that the honor of the government and people of the United States is involved in every inquiry whether rights secured by such stipulations shall be recognized and protected. And it would be wanting in proper respect for the intelligence and patriotism of a co-ordinate department of the government were it to doubt, for a moment, that these considerations were present in the minds of its members when the legislation in question was enacted."

The foregoing announcement is in accord with the traditional spirit of the courts of the United States relating to scrupulous respect for treaty obligations. Hon. Charles Warren, in his noted work, The Supreme Court in United States History (vol. 1, p. 782), referring to the case of United States v. De la Maza Arredondo, 31 U. S. (6 Pet.) 691, 8 L. Ed. 547, decided in 1832, says: "Few decisions of the Court at this period had a more permanent effect upon the history of the country; for in this case the Court established the public land policy of the Government on the basis of the most scrupulous respect for treaties, preferring to preserve the honor, rather than the property of the government, and to run the risk of confirming possibly fraudulent claims rather than to impair the reputation of the Government with foreign nations. In a superb opinion by Judge Baldwin, the Court had laid down the broad principle that, if a grant was made by a public official purporting to be in accordance with the laws of the sovereign power for which he was acting, there was a legal presumption that it was a valid official act, and that the burden rested on the United States to prove lack of authority. * * * These doctrines were again emphasized by Marshall in the Clarke Case (U. S. v. Clarke, 33 U. S. (8 Pet.) 436 [8 L. Ed. 1001]) in 1834."

In the light of this spirit, evidenced by the Supreme Court throughout our entire life as a nation, and without quoting further authorities, let the statute here at issue be examined.

The statute itself is not mute. In its first paragraph it declares " * * * there shall be imposed a tax * * * unless treaty provisions of the United States otherwise provide." (section 601)

It would be difficult, in our opinion, to select language less ambiguous in its terms than that quoted to express intent on the part of Congress to recognize and continue treaty obligations. Not only is there no express repeal; there is an express reservation by a clearly stated limitation running to the entire section which is wholly inconsistent with the idea of repeal even by implication.

It is, however, insisted on behalf of appellant that an examination of the legislative history of the section is proper in arriving at its correct construction, and hereunder it is urged that such history is conclusive of the fact that the phrase relative to treaty obligations was intended to preserve only the integrity of what is commonly referred to as the Cuban Reciprocity Treaty (33 Stat. 2137).

While, in the absence of ambiguity in the statute itself, we should hesitate long to declare the trial court in error for failing to consider that history further than it did, we nevertheless have investigated it from the official sources available, and, in our opinion, it tends to refute rather than to sustain the contention made on behalf of appellant.

The pertinent official history may be summarized as follows:

The bill, H. R. 10236, which became the Revenue Act of 1932, as reported to the House of Representatives by that body's Committee on Ways and Means, although

carrying provision for taxes to be collected upon importations of certain other articles, had no provision therein for a tax on coal. The provision for that was adopted as an amendment to the bill while the House was considering same, and appeared in the measure as it there passed in the following language:

"Sec. 601. Excise Taxes on Certain Articles. * * *

"(c) (5) That an excise tax shall be levied, collected, and paid upon the hereinafter described articles when imported from any foreign country into the United States, upon coal (anthracite or bituminous), coke, or coal or coke briquettes, 10 cents per one hundred pounds."

It also appears that said bill as reported to, and passed by, the House of Representatives, not only did not carry the language, "unless treaty provisions of the United States otherwise provide," which appears in paragraph (a), supra, but carried as subparagraph (5) of paragraph (b) of section 601, the following provision, relating back to paragraph (a) and forward to paragraph (c), viz.: "(5) such tax shall be imposed in full notwithstanding any provision of law or treaty granting exemption from or reduction of duties to products of any possession of the United States or of any country."

The report of the Committee on Ways and Means accompanying the bill to the House of Representatives and explaining its purposes, alluding to the immediate foregoing language, stated it to be the intention " * * * that treaties, such as the Cuban Reciprocity Treaty, and provisions of law exempting products of the various insular possessions from duty shall not be applicable with respect to the tax."

It will be borne in mind that at the time the foregoing report was made there was no provision in the bill for the tax on coal subsequently placed therein by amendment, as has been related.

In the form passed by the House, as above described, the bill was transmitted to the Senate and referred by the latter body to its Committee on Finance.

As reported from that Committee to the Senate, it was proposed to amend section 601 in numerous particulars, the proposals pertinent here being: (1) To insert in paragraph (a) the clause "unless treaty provisions of the United States otherwise provide"; (2) to strike from subparagraph (5) of paragraph (b), as quoted, supra, the phrase "or treaty" and "or of any other country"; and

(3) to make subparagraph (5) of paragraph (c), respecting coal, read as it does read in the law quoted, supra.

The report of the Committee on Finance, accompanying the bill to the Senate, among other things, said: "Section 601 imposes taxes on the importation of certain articles. In order that the imposition of these taxes shall not operate as an abrogation of the Cuban reciprocity treaty, subsections (a) and (b) (5) are amended so that the taxes shall be subject to the exemption from duty or to the preferential rate granted Cuban products."

The several amendments that have been so recited were adopted by the Senate, and were agreed to in the conference held by representatives of the two bodies for the purpose of composing differences, and, finally, by the House of Representatives.

The conference report, explaining the adjustments and agreements made by the conferees, said, upon the matter of the language relating to treaties: "This [Senate] amendment [130] makes the imposition of the tax on imported articles subject to any exemptions from duty or preferential rates provided by treaties of the United States insofar as the treaties are applicable; and the House recedes."

By the latter expression, "and the House recedes," was meant that the conferees on the part of the House had agreed that the House should recede from its original disagreement to the amendment.

The contention on behalf of appellant as to it being the intent of Congress, by inserting the treaty provisions phrase of paragraph (a), to preserve only the obligations of the Cuban Treaty, is based solely upon the statement contained in the report of the Senate Committee on Finance, which did, in terms, limit the statement of its (the Committee's) purpose to that instrument.

Concededly, however, the language of the act itself is, in its terms, broader than the Committee statement. In this connection it seems appropriate to take notice of the fact that our reciprocity treaty with Cuba is the only treaty of that nature existing between the United States and any foreign country, and it has been the uniform practice of the Congress in all tariff measures passed since the ratification of that treaty to recognize it in express language and by specific sections of the several acts.

Thus, section 316 of the Tariff Act of 1930 (19 USCA § 1316) reads: "Nothing in this chapter shall be construed to abrogate

or in any manner impair or affect the provisions of the treaty of commercial reciprocity concluded between the United States and the Republic of Cuba on December 11, 1902, or the provisions of the Act of December 17, 1903, chapter 1 [sections 124 and 125 of this title]."

This follows, substantially, the formula used in the tariff acts of 1909, 1913, and 1922, respectively, but no such provision is found in the Revenue Act of 1932.

Assuming, without holding, that resort to the legislative history is necessary to determine the legislative intent, and that the committee reports, as a part of that history, should be examined, it would certainly seem that the interpretive expressions of the reports of the conferees which went before both legislative branches should be of greater weight than the report of one committee to one branch.

There is but one reciprocity treaty with Cuba, but the statement explaining the conference report, supra, refers not to "a treaty" but to "treaties."

Furthermore, we find a statement of the conferees respecting Senate Amendment No. 132, which struck from the bill, as it passed the House, the language: " * * * Such tax shall be imposed in full notwithstanding any provision of law or treaty granting exemption from or reduction of duties to products of any possession of the United States or of any country."

Of this amendment the statement of the conferees says: " * * * The House bill provided for the imposition in full of the tax upon imported articles notwithstanding any provision of law or treaty granting exemption from or reduction of duty to products of any possession of the United States or of any country. The Senate amendment makes this provision inapplicable in the case of imported oil, coal, lumber, and copper, and provides that in the case of these articles Puerto Rico shall be treated as a part of the United States. The effect is to provide that the imposition of tax on the importation of these articles, with respect to which no corresponding tax on domestic sales is imposed, will be on the same basis with respect to the possessions as regular customs duty. The amendment also eliminates the references to treaties and to foreign countries, in accordance with the action on amendment No. 130. The House recedes."

The remaining question to be considered grows out of the character of the respective treaties themselves. The phraseology of the two differs in respects which, under some circumstances, may be, or become, quite material. The question is, Are the differences material here?

The treaty with Great Britain belongs to that class of treaties which are called "conditional most-favored-nation treaties," while that with Germany is unconditional.

The latter recites: "Any advantage of whatsoever kind which either High Contracting Party may extend to any article, the growth, produce, or manufacture of any other foreign country shall simultaneously and unconditionally, without request and without compensation, be extended to the like article the growth, produce or manufacture of the other High Contracting Party." Article 7.

The treaty with Great Britain contains no such "unconditionally" or "without request and without compensation" provisions, and it is insisted on behalf of appellant that, even if it be found that the coal imported from Germany is entitled to free entry, the coal from Great Britain is not.

In other words, it is insisted that, although the treaty with Germany may be self-executing, the treaty with Great Britain is an executory contract which requires affirmative legislation by Congress to render it effective.

In its opinion the trial court discussed this question quite fully, citing and quoting from various historical authorities and judicial decisions, including American Express Co. v. United States, supra, and concluded:

"The terms of the British treaty are generally in accord with those of the Austria-Hungarian treaty cited at page 159 [of 4 Cust. App.] of the American Express Co. Case, supra, except that the British treaty does not contain the paragraph to the effect that any particular favor granted to any other nation in navigation or commerce shall immediately become common to the other party. In that case the Government conceded that the position of each of the nations whose products were involved therein was equal to that of the one having the most advantageous treaty (page 159 [of 4 Cust. App.]).

"We think that situation obtains here, that is, inasmuch as we have held the products of Germany should be favored it must follow, as a matter of course, that the products of Great Britain should have similar treatment when imported into this country."

It would thus seem that the trial court associated the British Treaty of 1815 with the

German Treaty of 1925, and held the former effective in these cases by reason of the latter being held effective.

While we agree with the general conclusion reached by the trial court, we do not place our decision as to the importation from Wales upon the ground adopted by that tribunal, but take the view that each case may be properly determined without reference to the other.

It is our opinion that the Revenue Act of 1932 intended to, and did, take cognizance of the most-favored nation clauses of all treaties to which the United States were then a party.

The British treaty carries the clear provision: "No higher or other duties shall be imposed on the importation * * * of any articles [from Great Britain into the United States and vice versa] * * * than are or shall be payable on the like articles * * * of any other foreign country. * * *" Article 2.

The treaty and the statute are laws pari materia and must be construed together. Such being the situation, so far as the cases here before us are concerned, we fail to perceive any necessity for considering questions growing out of distinctions between treaties, self-executing in their provisions, and treaties which are not self-executing. As we view the matter, since, in 1932, coal was legally imported into the United States from Canada and Mexico duty free, the law, as contained in the statute and the British treaty, entitled the coal imported in that year from the United Kingdom of Great Britain and Ireland to free entry, without any reference to the treaty with Germany.

Our discussion of the cases here at issue has been confined strictly to the theories respecting them actually argued and emphasized by the respective parties. Reference was made in the brief on behalf of appellees to the doctrine announced by the Supreme Court of the United States in the Five Per Cent Cases (U. S. v. M. H. Pulaski Co.), 243 U. S. 97, 37 S. Ct. 346, 61 L. Ed. 617. It is not necessary for us to determine here the applicability of the doctrine of those cases, because assuming, without deciding, that the doctrine is here applicable, the conclusion would be the same, and upon either theory appellees are entitled to favorable decisions.

Let judgment be entered affirming the judgments of the United States Customs Court in both cases.

BLAND, Associate Judge, concurs in the conclusion.