314 F.2d 169
 H. G. MAISON, Individually and as Superintendent, Dept. of State Police of the State of Oregon, et al., Appellants,
v.
CONFEDERATED TRIBES OF the UMATILLA INDIAN RESERVATION et al., Appellees.
 No. 17139.
 United States Court of Appeals Ninth Circuit.
 February 15, 1963.
 
 Robert Y. Thornton, Atty. Gen. of Oregon, Arthur G. Higgs and Roy C. Atchison, Asst. Attys. Gen., Salem, Or., for appellant.
 Frank E. Nash, Mark C. McClanahan, King, Miller, Anderson, Nash & Yerke, Portland, Or., for appellees.
 Before HAMLIN, MERRILL and KOELSCH, Circuit Judges.
 KOELSCH, Circuit Judge.
 
 
 1
 This case involves fishing rights of the Confederated Tribes of the Walla Walla, Cayuse and Umatilla Indians under a treaty with the United States.
 
 
 2
 The District Court had jurisdiction under the provisions of 28 U.S.C. § 1331, relating to federal questions, and 28 U.S.C. § 2201, the Federal Declaratory Judgments Act. The provisions of 28 U.S.C. § 2281, requiring a three-judge court are not applicable and trial was properly had before a single judge.[1] Jurisdiction is conferred upon this court under the provisions of 28 U.S.C. § 1291.
 
 
 3
 It appears that late in May of 1855 a joint council was held at Camp Stevens in the Walla Walla Valley of the State of Washington between representatives of the United States and certain Indian tribes of Washington and Oregon. At that council the plaintiffs' ancestors were persuaded to accept a treaty containing the following provision:
 
 
 4
 "Provided, also, That the exclusive right of taking fish in the streams running through and bordering said reservation is hereby secured to said Indians, and at all other usual and accustomed stations in common with citizens of the United States, and of erecting suitable buildings for curing the same; the privilege of hunting, gathering roots and berries and pasturing their stock on unclaimed lands in common with citizens, is also secured to them."[2]
 
 
 5
 The controversy here concerns that portion of the treaty provision which relates to the Indians' right to fish outside their reservation "in common with citizens of the United States."
 
 
 6
 In 1958 the Oregon State Game Commission promulgated regulations prohibiting fishing on tributaries of the Columbia and Snake Rivers during part of the year. Shortly thereafter, the Commission caused three Indians to be arrested for fishing during the closed season in certain Blue Mountain streams that run into the Columbia. It further threatened to have arrested any members of the Confederated Tribes who fished contrary to the laws and regulations of Oregon.
 
 
 7
 Contending that the state's restriction of their fishing activities was contrary to the rights guaranteed them by treaty, the Confederated Tribes and several of its tribesmen sought a declaratory judgment and injunction. The court's judgment was generally favorable to the Indians:
 
 
 8
 "Ordered, Adjudged, and Decreed that the Confederated Tribes of the Umatilla Indian Reservation and the members thereof have a right, privilege, and immunity afforded them under the Treaty of June 9, 1855, between said Tribes and the United States of America, to catch salmon and steelhead for subsistence purposes at all usual and accustomed stations on tributaries of the Columbia and Snake rivers in Oregon, including the John Day, Walla Walla, Grande Ronde, and Imnaha river systems, without restriction or control under the game laws of the State of Oregon or regulations issued pursuant thereto."
 
 
 9
 Although the court declined to issue an injunction, it retained jurisdiction to grant such relief. The defendants have appealed.[3]
 
 
 10
 The extent of Indian fishing rights under a treaty between the United States and the Yakima Indians was in issue in United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). The court observed that prior to the treaty the Indians had unlimited fishing rights:
 
 
 11
 "The right to resort to the fishing places in controversy was a part of larger rights possessed by the Indians, upon the exercise of which there was not a shadow of impediment, and which were not much less necessary to the existence of the Indians than the atmosphere they breathed." 198 U.S. at 381, 25 S.Ct. 664.
 
 
 12
 Explaining the effect of the treaty upon those rights, the court continued:
 
 
 13
 "New conditions came into existence, to which those rights had to be accommodated. Only a limitation of them, however, was necessary and intended, not a taking away. In other words, the treaty was not a grant of rights to the Indians, but a grant of rights from them — a reservation of those not granted." (Emphasis added). Ibid.
 
 
 14
 The treaty involved in the instant case is substantially similar to the Yakimas' treaty and was negotiated at the same common council. Thus, the Supreme Court's analysis applies equally here. We hold that the plaintiffs' treaty reserves to them those unimpeded fishing rights which their ancestors had long enjoyed before the treaty, subject only to the qualifications contained within that document. But, the question remains, what are those qualifications?
 
 
 15
 One of them was pointed out in the Winans case. There it was stated that, because of the provision that the Indians were to fish "in common with citizens," the Indians had not retained an exclusive right to fish at their usual and accustomed stations. Citizens might share it.[4] United States v. Winans, supra at 381.
 
 
 16
 Another of the qualifications was explained in Tulee v. Washington, 315 U. S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942) and Makah Indian Tribe v. Schoettler, 192 F.2d 224 (9th Cir. 1951). In the former case it appears that one Tulee, an Indian, was convicted of catching salmon without a license required by a statute of the State of Washington. Tulee claimed the protection of the same treaty that was involved in the Winans case, arguing that it gave him a right to fish without restriction "at all usual and accustomed places" within the ceded area. The State countered with the argument that, because of the phrase "in common with citizens" the appellant's rights were no greater than those of other citizens. The court did not wholly approve either contention, but said:
 
 
 17
 "We think the state's construction of the treaty is too narrow and the appellant's too broad; that, while the treaty leaves the state with power to impose on Indians, equally with others, such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here." (Emphasis added). Tulee v. Washington, supra, 315 U.S. at 684, 62 S.Ct. at 864.
 
 
 18
 We applied the doctrine of the Tulee case in Makah. In that case the State of Washington had, by regulation, prohibited the catching of fish in the Hoko River except with a certain type of gear. As justification for the application of its regulation to the Indians, the State argued that the provision in the Makah Indians' treaty granting to them the right to fish "in common with all citizens" meant that the rights of the Indians were the same, and no greater, than those possessed by other citizens. However, rejecting that argument, we said: "The Supreme Court held in the Tulee case that where a treaty guarantees certain fishing rights to Indians and a state regulation impairs this right, the state must prove that its regulation is `necessary' * * *." Makah Indian Tribe v. Schoettler, supra, 192 F.2d at 226.
 
 
 19
 Thus, in both the Tulee and Makah cases it was held that the Indians' right to fish is qualified by the state's right to regulate such fishing when necessary for conservation. But, to establish necessity the state must prove two facts: first, that there is a need to limit the taking of fish, second, that the particular regulation sought to be imposed is "indispensable" to the accomplishment of the needed limitation.
 
 
 20
 Before discussing whether the defendants have sustained their burden of proof it will be helpful to briefly explain the life cycle of the salmon and steelhead fish. Such fish are anadromous; that is to say, they are born in fresh water streams, migrate to and live the greater part of their lives in the ocean and, just before dying, return to the place of their birth to spawn. The fish born in a particular stream are delicately adjusted to its peculiar characteristics and instinctively return to it at the time of the year when successful spawning can occur. Attempts at stocking barren streams have been costly and only sporadically successful, and severe decimation of a run of fish in a particular stream can result in the permanent destruction of its population. In traveling upstream to spawn many debilitating hardships are encountered, including natural predators, disease and water pollution. By the time they reach the spawning ground, the body oils of the fish are practically used up, and they are often cut, bruised, diseased, and afflicted with fungus growths.
 
 
 21
 Defendants contend that "conservation through wise use, the keynote of modern fisheries management," dictates that the plaintiffs' fishing on the spawning grounds be restricted because the value of the fish there is highest as seed stock but lowest as food. In support of that contention they cite the testimony of three expert witnesses; namely, Robert N. Thompson, a fishery biologist of the Fish Commission of Oregon, Richard T. Pressey, Supervisor of Research for the Department of Fisheries of the State of Washington, and Dr. H. John Rayner, Chief of the Wildlife Research Division of the Oregon State Game Commission.
 
 
 22
 Thompson's testimony, to the effect that unrestricted fishing of sufficient industry could exhaust the spawning beds, is a proposition about which there can be no quarrel. However, he did not relate that proposition to the facts of this case, but, on the contrary, testified that the plaintiffs have never shown a disposition to fish with marked intensity.
 
 
 23
 Pressey testified that commercial fishing by Indians on spawning grounds in the State of Washington had seriously reduced some runs; further, that the taking of fish by the plaintiffs for their own subsistence would have a similar, although not as serious, effect. However, the trial court was not bound to accept this testimony. It was largely based upon the reports of an interested party; furthermore, the witness acknowledged that the number of fish had been increasing in the Blue Mountain streams in recent years and that, in the absence of depletion, there would be no need for regulation.
 
 
 24
 Dr. Rayner testified that the taking of fish from the spawning grounds creates an "unhealthy situation," that it is inconsistent with "efficient conservation methods," that "indiscriminate" fishing endangers the fish life of a stream, and that fish "must be protected" in their spawning beds. These statements are ambiguous and vague, but even if they reflected an opinion of the witness that restriction of plaintiffs' fishing was necessary for conservation, nevertheless, that opinion was not binding on the trial court.
 
 
 25
 In Dr. Rayner's view, "conservation" is a term which involves a compromise of the competing interests of the many groups of society that desire or need fish. Such a definition is reasonable. However, Dr. Rayner further explained that, by "conservation," the Oregon Game Commission seeks to protect only commercial and sports fishermen, having no regard for the welfare of Indians. If, as it is reasonable to believe, Dr. Rayner used the word "conservation" in the sense that it was used by his employer, the Oregon Game Commission, when he testified to the necessity for conservation, he really meant, "I believe that the regulations are necessary to conserve fish for commercial and sports fishermen, disregarding the needs of the Indians altogether."
 
 
 26
 Such a statement is not evidence of that "necessity for conservation" required by the Tulee case. In that case the Supreme Court held that a regulation, to be necessary, must be "indispensable" to the effectiveness of a state conservation program. It follows that restriction of the fishing of Indians is justifiable only if necessary conservation cannot be accomplished by a restriction of the fishing of others. Dr. Rayner, in testifying that a limitation of plaintiffs' fishing was necessary, not only ignored that requirement, but based his opinion on the contrary premise that the taking of fish by Indians can validly be restricted to satisfy the needs of the rest of society.
 
 
 27
 But even if the trial judge disregarded the many deficiencies and contradictions in the experts' testimony and attributed to that testimony some probative value on the issue of necessity, nevertheless, his decision that the defendants failed to sustain their burden of proof on that issue must be upheld. The trier of fact is not bound to adopt the conclusion of experts where it is contrary to his best judgment. United States v. Hill, 62 F.2d 1022 (8th Cir. 1933); Tracy v. Commissioner, 53 F.2d 575 (6th Cir. 1931), cert. denied, 287 U.S. 632, 53 S.Ct. 83, 77 L.Ed. 548 (1932). The trial judge could justifiably doubt the validity of the experts' conclusions in view of the other evidence that the number of fish taken by the plaintiffs is only a small percentage of the total salmon and steelhead harvest; that the plaintiffs have never, in over a century, destroyed a salmon run in the Blue Mountain streams or so depleted a run that destruction was threatened; and that, not only has the number of fish in these streams been increasing in recent years, the population of the Confederated Tribes is small and probably is declining.[5]
 
 
 28
 Because the court found that no conservation was necessary its broadly worded judgment, applying to any laws or regulations of the State of Oregon, is proper. Of course, a substantial change in conditions may warrant the later imposition of restrictions upon plaintiffs' fishing.
 
 In its opinion the trial court stated:
 
 29
 "Although the closure of streams during portions of the year is one method of conserving the resource and may be generally fair and convenient, it cannot be permitted to curtail treaty fishing rights of Indians where there are alternative methods of attaining the same objectives."[6]
 
 
 30
 It is apparent from this that the judgment not only was grounded upon a finding that no restriction of plaintiffs' fishing was necessary, but also, upon a finding that if it was necessary, the laws and regulations specifically involved in this case could not be imposed.
 
 
 31
 But the defendants argue that none of the alternative conservation measures specifically enumerated in the trial court's findings were available. For example, one of those listed was that the defendants could achieve conservation by limiting or prohibiting the taking of fish by sportsmen on the spawning grounds, and defendants argue that to do this would violate the provisions of the treaty.
 
 
 32
 However, the treaty dealt only with the rights of the plaintiffs' ancestors, and did not secure rights to any other group or class. Therefore, while a restriction of the fishing activities of the plaintiffs must be indispensable, as required by the treaty [Tulee v. Washington, supra.], a restriction of the fishing activities of other citizens of a state is valid if merely reasonable, as required by the Fourteenth Amendment to the United States Constitution. Thomson v. Dana, 52 F.2d 759 (D.Ore.1931), aff'd. 285 U.S. 529, 52 S.Ct. 409, 76 L.Ed. 925 (1932). The complete exclusion of sports fishermen from the spawning grounds as an alternative does not amount to arbitrary discrimination against them, because the state possesses broader power to regulate sports fishing than it does to regulate fishing by the Indians. This one of the alternatives listed by the court being available, we need not discuss the others.
 
 
 33
 The judgment is affirmed.
 
 
 
 Notes:
 
 
 [1]
 28 U.S.C. § 2281 provides that where an injunction is sought restraining the enforcement or execution of a state statute or an order of an administrative agency acting thereunder, upon the ground of the unconstitutionality of such statute, the matter must be determined by a district court composed of three judges. But that provision has no application to this litigation, for the issue is not whether a statute of the State of Oregon or a regulation of its Game Commission is unconstitutional; rather, the issue is whether statutes and regulations, admittedly valid, can be applied to these plaintiffs. See Phillips v. United States, 312 U.S. 246, 61 S.Ct. 480, 85 L.Ed. 800 (1941)
 
 
 [2]
 Treaty with the Walla Walla, Cayuses, and Umatilla Tribes and Bands of Indians, June 9, 1855, Art. I, 12 Stat. 945
 
 
 [3]
 The trial court's opinion is reported at D.C., 186 F.Supp. 519
 
 
 [4]
 Of course, this does not mean that a state cannot, by reasonable laws and regulations, exclude from fishing those of its citizens who are not parties to the treaty
 
 
 [5]
 In 1855 there were approximately 1500 Indians in the Confederated Tribes; at the time of the trial they numbered only about 1200
 
 
 [6]
 Confederated Tribes of the Umatilla Indian Reservation v. Maison, 186 F.Supp. 519, 520-521 (D.Or.1960)