Richard SOHAPPY et al., Plaintiffs,

v.

McKee A. SMITH, Edward G. Huffschmidt, J. I. Eoff, Commissioners, Oregon Fish Commission; Robert W. Schoning, Director, Oregon Fish Commission, their agents, servants, employees and those persons in active concert or participation with them; John W. McKean, Director, Oregon Game Commission, his agents, servants, employees and those persons in active concert or participation with him, Defendants.

UNITED STATES of America, Plaintiff,

v.

STATE OF OREGON, Defendant,

and

The Confederated Tribes of the Warm Springs Reservation of Oregon; Confederated Tribes & Bands of the Yakima Indian Nation; Confederated Tribes of the Umatilla Indian Reservation; and Nez Perce Tribe of Idaho, Intervenors.

Civ. Nos. 68409, 68513.

United States District Court
D. Oregon.
July 8, 1969.

Sidney I. Lezak, U. S. Atty., Michael L. Morehouse, Asst. U. S. Atty., District of Oregon, George D. Dysart, Assistant Regional Solicitor. United States Dept. of Interior, Portland, Or., for the United States.

James B. Hovis, Yakima, Wash., for Yakima Indian Nation.

Owen M. Panner, David F. Berger, Bend, Or., for Warm Springs Tribe.

Mark C. McClanahan, Dean D. De-Chaine, King, Miller, Anderson, Nash & Yerke, Portland, Or., for Umatilla Tribe.

Arthur Lazarus, Jr., Washington, D. C., Robert C. Strom, Craigmont, Idaho, John T. Lewis, The Dalles, Or., for Nez Perce Tribe of Idaho.

Robert A. Bennett, Willner, Bennett & Leonard, Portland, Or., Jack Greenberg, Melvyn H. Zarr, National Office for the Rights of the Indigent, New York City, David R. Hood, MacDonald, Hoague & Bayless, Seattle, Wash., Donald J. Horowitz, Farris, Bangs & Horowitz, Seattle, Wash., Ralph W. Johnson, School of Law, University of Washington, Seattle, Wash., for Richard Sohappy and others.

Robert Y. Thornton, Atty. Gen., George S. Woodworth, Henry Kane, Asst. Attys. Gen., Roy C. Atchison, Asst. Atty. Gen., Portland, Or., for McKee A. Smith and State of Oregon.

### OPINION

BELLONI, District Judge.

Fourteen individual members of the Confederated Tribes and Bands of the Yakima Indian Nation filed case No. 68–409 against the members and director of the Fish Commission of the State of Oregon and the Oregon State Game Commission. They seek a decree of this court defining their treaty right "of taking fish at all usual and accustomed places" on the Columbia River

and its tributaries and the manner and extent of the State of Oregon may regulate Indian fishing.

Shortly thereafter the United States on its own behalf and on behalf of the Confederated Tribes and Bands of the Yakima Reservation, the Confederated Tribes and Bands of the Umatilla Reservation composed of the Walla Walla, Cayuse and Umatilla Bands or Tribes, the Nez Perce Indian Tribe and "all other tribes similarly situated" filed case No. 68–513. Upon their individual motions the Warm Springs Tribe, the Yakimas, the Umatillas and the Nez Perce Tribe were permitted to intervene in their own behalf. Following the intervention of the Warm Springs Tribe and upon the inability of government counsel to identify any other tribes who were "similarly situated", the State's motion to strike the reference to such other tribes was granted.

Sohappy v. Smith is brought pursuant to 28 U.S.C. § 1331(a). United States v. Oregon is pursuant to 28 U.S.C. § 1345. In each case the matter in controversy exceeds $10,000. Declaratory judgments are sought pursuant to 28 U. S.C. § 2201. By order of this court the proceedings were consolidated for pretrial procedures and for trial. Fed.R. Civ.P. 42(a).

In both actions the defendants moved that the cases be heard by a three-judge court pursuant to 28 U.S.C. § 2281 and that the actions be dismissed for failure to join the State of Washington as an indispensable party pursuant to Rule 19. Defendants also moved to dismiss No. 68–409 as being a suit against the state in contravention of the Eleventh Amendment of the United States Constitution, and for lack of plaintiffs' standing to sue as individuals. All of the foregoing motions were denied. These cases challenge the validity of certain Oregon Statutes and regulations under the Supremacy Clause of the Constitution of the United States as being contrary to certain treaties of the United States. U.S.Const. Article VI, Clause 2. A three-judge court is not authorized in these cases. Swift & Co. v. Wickham, 382 U.S. 111, 86 S.Ct. 258, 15 L.Ed.2d 194 (1965); Jehovah's Witnesses in State of Washington v. King County Hospital et al., 278 F.Supp. 488 (W.D.Wash.1967), aff'd 390 U.S. 598, 88 S.Ct. 1260, 20 L.Ed.2d 158 (1968); Ness Produce Co. v. Short, 263 F.Supp. 586 (D.Or.1966), aff'd 385 U.S. 537, 87 S.Ct. 742, 17 L.Ed.2d 591 (1967). Neither the State of Washington nor any official thereof is an indispensable party to these actions. Fed.R.Civ.P. 19; Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968). No. 68–409 is not a suit against the State of Oregon and is not barred by the Eleventh Amendment of the United States Constitution. Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); Georgia Railroad and Banking Co. v. Redwine, 342 U.S. 299, 72 S.Ct. 321, 96 L.Ed. 335 (1952). The individual plaintiffs in No. 68–409 have an interest in the controversy and have standing to maintain that action to assert that interest.

By agreement of the parties, the cases were heard by the court without a jury and certain issues were segregated for separate hearings and determination. This opinion deals with those issues.

In 1855 the United States negotiated separate treaties with each of the above named Indian tribes. These treaties were ratified and proclaimed by the United States in 1859. Treaty of June 9, 1855, with the Yakima Tribe (12 Stat. 951); Treaty of June 25, 1855, with the Tribes of Middle Oregon (12 Stat. 963); Treaty of June 9, 1855, with the Umatilla Tribe (12 Stat. 945); Treaty of June 11, 1855, with the Nez Perce Tribe (12 Stat. 957). Each of these treaties contained a substantially identical provision securing to the tribes "the right of taking fish at all usual and accustomed places in common with citizens of the Territory."

Most of the argument has centered around the state's interpretation of that provision. It believes that it gives the treaty Indians only the same rights as

given to all other citizens. Such a reading would not seem unreasonable if all history, anthropology, biology, prior case law and the intention of the parties to the treaty were to be ignored.

I will review some of these factors and declare the rights of the parties.

Subsequent to the execution of the treaties and in reliance thereon the members of said four tribes have continued to fish for subsistence and commercial purposes at their usual and accustomed fishing places. Such fishing provided and still provides an important part of their subsistence and livelihood. Both prior to and subsequent to the treaties, the Indians used a variety of means to take fish, including various types of nets, weirs and gaff hooks.

The policy of the United States to extinguish Indian rights in the Oregon Territory by negotiation rather than by conquest was firmly established in the Act of August 14, 1848 (9 Stat. 323) which established the Oregon Territory. That act declared that nothing in it "shall be construed to impair the rights of persons or property now pertaining to the Indians in said Territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians. * * *." The act also extended to the Oregon Territory the provisions of the Northwest Ordinance of 1787 which provided, among other things, that "good faith shall always be observed towards the Indians; their land and property shall never be taken from them without their consent." (1 Stat. 51, Note a)

The treaties with which we are here concerned are parts of the result of that policy. They are not treaties of conquest but were negotiated at arm's length. The word of the United States was pledged. Today, some 114 years later, all of the parties to those treaties are in essential agreement as to their meaning and they have joined in asking this court to confirm that construction. Only the State of Oregon, successor to many of the rights of the United States, disagrees with the interpretation which the parties to the treaties assert here.

It hardly needs restatement that Indian treaties, like international treaties, entered into by the United States are part of the supreme law of the land which the states and their officials are bound to observe. United States v. 43 Gallons of Whiskey (United States v. Lariviere et al.), 93 U.S. (3 Otto) 188, 23 L.Ed. 846 (1876); Worcester v. Georgia, 31 U.S. (6 Peters) 515, 8 L.Ed. 483 (1832). The Supreme Court has on numerous occasions noted that while the courts cannot vary the plain language of an Indian treaty, such treaties are to be construed:

"as 'that unlettered people' understood it, and, 'as justice and reason demand in all cases where power is exerted by the strong over those to whom they owe care and protection,' and counterpoise the inequality 'by the superior justice which looks only to the substance of the right, without regard to technical rules,' Choctaw Nation v. United States, 119 U.S. 1, 7 Sup.Ct. 75, 30 L.Ed. 306; Jones v. Meehan, 175 U.S. 1, 20 Sup.Ct. 1, 44 L.Ed. 49.' United States v. Winans, supra. [198 U.S. 371, 49 L.Ed. 1089, 25 Sup.Ct.Rep. 662]" Northern Pacific Railway Co. v. United States, 227 U.S. 355, 366, 33 S.Ct. 368, 57 L.Ed. 544 (1913).

"It is our responsibility to see that the terms of the treaty are carried out, so far as possible, in accordance with the meaning they were understood to have by the tribal representatives at the council and in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." Tulee v. Washington, 315 U.S. 681, 684, 62 S.Ct. 862, 86 L.Ed. 1115 (1942).

The Columbia River has long been one of the world's major producers of salmonid fish. Several species of salmon and steelhead trout inhabit the river and its tributaries. They are spawned in the tributaries, headwaters and main-

stem, migrate to the Pacific Ocean where they spend the bulk of their adult life, return generally to the river or stream of their origin, spawn, and, in case of salmon, die. From aboriginal times these salmon and steelhead have been a highly prized source of food. They are also a major recreational attraction to sports fishermen.

From the earliest known times, up to and beyond the time of the treaties, the Indians comprising each of the intervenor tribes were primarily a fishing, hunting and gathering people dependent almost entirely upon the natural animal and vegetative resources of the region for their subsistence and culture. They were heavily dependent upon such fish for their subsistence and for trade with other tribes and later with the settlers. They cured and dried large quantities for year around use. With the advent of canning technology in the latter half of the 19th Century the commercial exploitation of the salmonid resource by non-Indians increased tremendously. Indians, fishing under their treaty-secured rights, also participated in this expanded commercial fishery and sold many fish to non-Indian packers and dealers.

During the negotiations which led to the signing of the treaties the tribal leaders expressed great concern over their right to continue to resort to their fishing places and hunting grounds. They were reluctant to sign the treaties until given assurances [1] that they could continue to go to such places and take fish and game there. The official records of the treaty negotiations prepared by the United States representatives reflect this concern and also the assurances given to the Indians on this point as inducement for their acceptance of the treaties.

The Supreme Court has recently restated the nature of the non-exclusive off-reservation fishing rights secured by these Indian treaties. In Puyallup Tribe et al. v. Department of Game et al., 391 U.S. 392, 88 S.Ct. 1725, 20 L. Ed.2d 689 (1968), it declared:

"The right to fish 'at all usual and accustomed' places may, of course, not be qualified by the State, even though all Indians born in the United States are now citizens of the United States. * * * But the manner of fishing, the size of the take, the restriction of commercial fishing, and the like may be regulated by the State in the interest of conservation, provided the regulation meets appropriate standards and does not discriminate against the Indians." ·

The Court referred to its earlier decisions in Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942), and United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905) and affirmed the view that to the extent "necessary for the conservation of the fish" the state could exercise its police power to impose appropriate restrictions on the time and manner of fishing that did not discriminate against the Indians.

It will facilitate an understanding of the issues involved in these cases if we note briefly certain points that are not here in issue. None of the plaintiffs or intervenor tribes denies the jurisdiction of the State of Oregon to regulate Indian exercise of these off-reservation fishing rights. Nor do they deny the need for regulation of Indian commercial fishing on the Columbia River to protect fish stocks. As the issue is stated in the Government's brief, "The concept of necessary regulation we accept, and we accept the states as being one class of agents of the public to determine and administer such regulations—provided they act with due regard to their responsibilities under the laws of this land, including these treaties."

▮ The issue in these cases concerns the limitation on the state's power to

---

1. At the time of presenting the treaty to the Cayuse, Walla Walla and Nez Perce for signing, Governor Stevens prompting a reluctant Nez Perce Chief stated:

"Looking Glass knows that he can * * * catch fish at any of the fishing stations." Record of Proceedings Walla Walla Valley Treaty Council June 9th, 1855, p. 145.

regulate the exercise of the Indians' federal treaty right. At least three such limitations are indicated by the Supreme Court in its *Puyallup* decision. First, the regulation must be "necessary for the conservation of the fish." Second, the state restrictions on Indian treaty fishing must "not discriminate against the Indians." And third, they must meet "appropriate standards."

The regulations and policies heretofore applied by the state's regulatory and enforcement agencies have been premised upon the belief that, except for a right of access over private lands and exemption from the payment of license fees, the treaties afforded the Indians no rights beyond those accorded under the Fourteenth Amendment of the United States Constitution and under Article 1, Section 20, of the Oregon Constitution. The state argues that its regulatory scheme complies with the treaty requirements so long as the specific regulations applicable at any particular time or place impose no greater restriction on Indians fishing at such time or place than are imposed upon others fishing there. The state contends that the Indians' right to take fish at their usual and accustomed places is not a right that must be given any separate recognition or protection or be separately dealt with in the state's regulatory scheme. It argues that it may, in the interest of conservation, impose any restriction on treaty Indians fishing at their usual and accustomed places which it may impose upon non-Indians fishing at those same locations, even to the point of completely closing certain such areas to all forms of commercial fishing. It further argues, on the basis of its reading of a number of federal court decisions, including Puyallup Tribe et al. v. Department of Game, supra, that it may not allow Indians to fish at their usual and accustomed places in any manner or at any time that it does not similarly allow non-Indians to fish at those same locations. There is no support in any of these federal cases for any such narrow interpretation of the state's authority to distinguish between the regulation of Indian treaty-protected fishing and that of fishing by others.

The plaintiffs and intervenor tribes contend that before Oregon may regulate the taking and disposition of fish by treaty Indians at their usual and accustomed fishing places:

"(a) It must establish preliminary to regulation that the specific proposed regulation is both reasonable and necessary for the conservation of the fish resource. In order to be necessary, such regulations must be the least restrictive which can be imposed consistent with assuring the necessary escapement of fish for conservation purposes; the burden of establishing such facts is on the state.

"(b) Its regulatory agencies must deal with the matter of the Indians' treaty fishing as a subject separate and distinct from that of fishing by others. As one method of accomplishing conservation objectives it may lawfully restrict or prohibit non-Indians fishing at the Indians' usual and accustomed fishing places without imposing similar restrictions on treaty Indians.

"(c) It must so regulate the taking of fish that the treaty tribes and their members will be accorded an opportunity to take, at their usual and accustomed fishing places, by reasonable means feasible to them, a fair and equitable share of all fish which it permits to be taken from any given run."

They also contend that ORS 511.106(1), 506.006(4), and certain orders of the Fish Commission establishing closed areas or seasons above Bonneville Dam may not be applied so as to prevent Indians from taking fish at their usual and accustomed places east of the confluence of the Columbia and Deschutes Rivers under their treaty rights because such application is not reasonable and necessary for conservation and constitutes an arbitrary and unreasonable total prohibition against the exercise of such treaty rights. In addition, they

contend that such application of the regulations violates ORS 506.045.

As is discussed more fully below, I believe that these contentions of the plaintiffs and the tribes correctly state the law applicable to state regulation of the Indians' federal treaty right.

Under Oregon law responsibility for the management of the fish resources of the state is divided between the Fish Commission and the Game Commission, with the former having exclusive jurisdiction over all fish other than game fish. ORS 506.040. The Game Commission has jurisdiction over game fish. ORS 496.160. Salmon and steelhead are food fish except when taken by angling, in which case they are classified as game fish. Subject to certain statutory limitations, the Fish Commission and Game Commission are each given broad authority to regulate the times, places and manner of taking fish and the possession and disposition of fish in waters or areas under the state's jurisdiction. One such statutory limitation, dating back to 1901 and presently contained in ORS 511.106(1) permanently closes the area east of the confluence of the Columbia and Deschutes Rivers to any fishing by any means other than angling.

The defendants' narrow interpretation of the Indians' rights under the treaties has been consistently rejected by the higher federal courts. Puyallup Tribe et al. v. Department of Game et al., supra; Tulee v. Washington, supra; Holcomb v. Confederated Tribes of the Umatilla Indian Reservation, 9 Cir., 382 F.2d 1013 (1967); Maison v. Confederated Tribes of the Umatilla Indian Reservation, 314 F.2d 169 (9th Cir. 1963), cert. denied 375 U.S. 829, 84 S.Ct. 73, 11 L.Ed.2d 60 (1963); Makah Indian Tribe v. Schoettler, 192 F.2d 224 (9th Cir. 1951). The question was most recently examined by the Supreme Court in Puyallup Tribe et al. v. Department of Game et al., supra, where, as previously noted, certain limitations on the state's regulatory authority over this federal right were mentioned. We turn now to a discussion of those limitations.

The parties place differing interpretations on the limitations on state authority inherent in the requirement that the state restriction on treaty-referenced fishing must be "necessary for the conservation of the fish."

By this reference the Supreme Court was undoubtedly speaking of conservation in the sense of perpetuation or improvement of the size and reliability of the fish runs. It was not endorsing any particular state management program which is based not only upon that factor but also upon allocation of fish among particular user groups or harvest areas, or classification of fish to particular uses or modes of taking.

■ The state may regulate fishing by non-Indians to achieve a wide variety of management or "conservation" objectives. Its selection of regulations to achieve these objectives is limited only by its own organic law and the standards of reasonableness required by the Fourteenth Amendment. But when it is regulating the federal right of Indians to take fish at their usual and accustomed places it does not have the same latitude in prescribing the management objectives and the regulatory means of achieving them. The state may not qualify the federal right by subordinating it to some other state objective or policy. It may use its police power only to the extent necessary to prevent the exercise of that right in a manner that will imperil the continued existence of the fish resource. The measure of the legal propriety of a regulation concerning the time and manner of exercising this "federal right" is, therefore, "distinct from the federal constitutional standard concerning the scope of the police power of the State." Puyallup Tribe et al. v. Department of Game et al., supra, footnote 14, 391 U.S., p. 402, 88 S.Ct., p. 1730. To prove necessity, the state must show there is a need to limit the taking of fish and that the particular regulation sought to be imposed upon the exercise of the treaty right is necessary to the accomplishment of the needed limitation. This applies

to regulations restricting the type of gear which Indians may use as much as it does to restrictions on the time at which Indians may fish.

 Oregon's conservation policies are concerned with allocation and use of the state's fish resource as well as with their perpetuation. It has divided the regulatory and promotional control between two agencies—one concerned with the protection and promotion of fisheries for sportsmen (ORS 496.160) and the other concerned with protection and promotion of commercial fisheries (ORS 506.036). The regulations of these agencies, as well as their extensive propagation efforts, are designed not just to preserve the fish but to perpetuate and enhance the supply for their respective user interests. This is shown not only in the documentary evidence in this case but in the deposition testimony of Fish Commission personnel.

The Director of the Fish Commission testified as follows:

"Q. Now, isn't it true that in fixing seasons, establishing gear limitations and the like below the escapement goal point, wherever it is, what the Fish Commission is doing really is only deciding where the harvestable portion of the run is to be caught?

"A. That is one of the things we are doing. We are also more accurately assuring that we might get the escapement.

"\* \* \*

"Q. Paraphrasing from what you said a moment ago, would it not be best to have one regulatory agency regulate both the offshore landing, sports control and also the in-river landings, both commercial, gill and Indian and sports?

"A. It's been our stated position that a single resource such as anadromous fish could best be managed by a single entity.

"Q. Correct. Now, if a single entity has that authority and that responsibility, is it not true that that single entity must make some determination between the various user groups or taking groups as to what *percentage or what use or what landing of the resource* that this particular user group may make of it?

"A. *In some way, deliberately or inadvertently,* this decision must be made." (Schoning Dep. Ex. 45 Vol. III, pp. 44, 90–91) (Emphasis supplied)

The research biologist and project leader for the Commission's Columbia River investigations testified:

"Q. Now, these people that fish in the lower river, if you open up an area above Bonneville Dam, and consequently have to reduce the fishing that is done below Bonneville Dam and still maintain the escapement goal, a run that will reach your escapement goal, by setting the length of season at various places along the river, in effect, you are determining who catches the fish, aren't you?

"A. *To some extent, I am sure we are.* Every regulation we set for fishermen below Bonneville, someone objects to it; because they feel they are being discriminated against because there are more fish going out of Astoria, and they have to fish up at Portland. So, many fish up at Astoria and some fish up around Corbett.

"\* \* \*

"Q. Isn't it your experience at these meetings with the Washington Department of Fisheries and the Oregon Fish Commission, that they try in some manner to come up with a regulation that is not unpopular?

"A. I think as much as possible if you could still achieve the escapement goal. They try to accommodate *as many people as possible* just within the authority and within their responsibility as they see it and maintain the resource. They try to do it. I think it is a fair statement.

"\* \* \*

"Q. You also have to take into consideration those compromises among those different people that are dissatisfied that you mentioned earlier?

"A. I don't personally. The Commission does." (Oakley Dep., Ex. A–46, pp. 58–59, 60–61, 62) (Emphasis supplied)

■ There is no evidence in this case that the defendants have given any consideration to the treaty rights of Indians as an interest to be recognized or a fishery to be promoted in the state's regulatory and developmental program. This same discriminatory aspect of the state's conservation policy was recognized earlier by the court of appeals in Maison v. Confederated Tribes of the Umatilla Indian Reservation, 314 F.2d at 173.

The parties also place widely differing interpretations upon the Supreme Court's criteria that the state's restriction on the time and manner of fishing by treaty Indians must not discriminate against the Indians. The state believes that this means only that each law or regulation must be equally applicable to Indian and non-Indian. The United States, on the other hand, contends that the state's over-all regulation of the fishery must not discriminate against the Indians' exercise of their treaty rights in favor of the taking of fish by others at other locations—that it is the treaty right which must be given equal protection with other interests in the state's regulatory scheme. It says that in the case of anadromous fish the total impact of the state's regulations on the entire run as it proceeds through the area of the state's jurisdiction must be considered; that a nondiscriminatory set of regulations requires that treaty Indians be given an opportunity to catch fish at their usual and accustomed places equal to that of other users to catch fish at locations preferred by them or by the state.

In considering the problem of salmon and steelhead conservation in the Colum-

bia River and its tributaries, it is necessary to consider the entire Columbia River system. The off-shore fishery in the Pacific Ocean has some effect on the numbers of fish that enter the river. The salmon and steelhead that enter the Columbia River are anadromous fish and spend much of their adult life in the Pacific Ocean. Therefore, they must pass as fingerlings down the Columbia River to the sea; and as adults they must pass up the Columbia River into the particular tributary or area where they spawn.

One of the principal tools which the states of Oregon and Washington use for managing most runs of the anadromous fish resources of the Columbia River system is the "escapement goal." This goal is set by the Fish Commission, generally in conjunction with the Washington Department of Fisheries, as being the estimated numbers of fish which must escape above all commercial fishing in order that, considering all factors which influence the matter above that point, the greatest aggregate numbers of fish from such fish run will be produced and return down the Columbia to the Pacific Ocean. In establishing the escapement goal for a particular run the Fish Commission and its biological staff consider the losses which will occur above the escapement goal point from all causes, including natural causes, losses at dams and the sports catch on the upstream and tributaries in Oregon, Washington and Idaho. All the estimated numbers of fish in a given run in excess of the escapement goal are regarded by the Fish Commission as harvestable.

The state regulates fishing within its borders from the Continental Shelf to the upper limits of the river and its tributaries. It manages its resources to allow the harvest to be taken on whatever portions of the river it desires. It must manage the over-all fish run in a way that does not discriminate against the treaty Indians as it has heretofore been doing. Oregon recognizes sports fishermen and commercial fishermen and seems to attempt to make an equita-

ble division between the two. But the state seems to have ignored the rights of the Indians who acquired a treaty right to fish at their historic off-reservation fishing stations. If Oregon intends to maintain a separate status of commercial and sports fisheries, it is obvious a third must be added, the Indian fishery. The treaty Indians, having an absolute right to that fishery, are entitled to a fair share of the fish produced by the Columbia River system.

The Supreme Court has said that the right to fish at all usual and accustomed places may not be qualified by the state. Puyallup Tribe et al. v. Department of Game, et al., supra, 391 U. S., p. 398, 88 S.Ct. 1725, 20 L.Ed.2d 689. I interpret this to mean that the state cannot so manage the fishery that little or no harvestable portion of the run remains to reach the upper portions of the stream where the historic Indian places are mostly located.

It is clear that the state has the full and complete power to regulate all kinds of fishing, including the Indian fishery, to the end that the resource is preserved. There is no reason to believe that a ruling which grants the Indians their full treaty rights will affect the necessary escapement of fish in the least. The only effect will be that some of the fish now taken by sportsmen and commercial fishermen must be shared with the treaty Indians, as our forefathers promised over a hundred years ago.

In prescribing restrictions upon the exercise of Indian treaty rights the state may adopt regulations permitting the treaty Indians to fish at their usual and accustomed places by means which it prohibits to non-Indians. Maison v. Confederated Tribes of the Umatilla Indian Reservation, supra. While the treaties do not give the Indians the right to insist that the state restrict non-Indians to a greater degree than it restricts Indians, neither do they limit the state's authority to restrict non-Indian fishing.

In determining what is an "appropriate" regulation one must consider the interests to be protected or objective to be served. In the case of regulations affecting Indian treaty fishing rights the protection of the treaty right to take fish at the Indians' usual and accustomed places must be an objective of the state's regulatory policy co-equal with the conservation of fish runs for other users. The restrictions on the exercise of the treaty right must be expressed with such particularity that the Indian can know in advance of his actions precisely the extent of the restriction which the state has found to be necessary for conservation. Cf. Winters v. New York, 333 U.S. 507, 515, 68 S.Ct. 665, 92 L.Ed. 840 (1948); Cline v. Frink Dairy Company, 274 U.S. 445, 465, 47 S.Ct. 681, 71 L.Ed. 1146 (1927); United States v. Reese, 92 U.S. 214, 221, 23 L.Ed. 563 (1875).

This court cannot prescribe in advance all of the details of appropriate and permissible regulation of the Indian fishery, nor do the plaintiffs ask it to. As the Government itself acknowledges, "proper anadromous fishery management in a changing environment is not susceptible of rigid pre-determination. * * * the variables that must be weighed in each given instance make judicial *review* of state action, through retention of continuing jurisdiction, more appropriate than overly-detailed judicial predetermination." The requirements of fishery regulation are such that many of the specific restrictions, particularly as to timing and length of seasons, cannot be made until the fish are actually passing through the fishing areas or shortly before such time. Continuing the jurisdiction of this court in the present cases may, as a practical matter, be the only way of assuring the parties an opportunity for timely and effective judicial review of such restrictions should such review become necessary.

I also do not believe that this court should at this time and on this record attempt to prescribe the spe-

cific procedures which the state must follow in adopting regulations applicable to the Indian fishery. The state must recognize that the federal right which the Indians have is distinct from the fishing rights of others over which the state has a broader latitude of regulatory control and that the tribal entities are interested parties to any regulation affecting the treaty fishing right. They, as well as their members to whom the regulations will be directly applicable, are entitled to be heard on the subject and, consistent with the need for dealing with emergency or changing situations on short notice, to be given appropriate notice and opportunity to participate meaningfully in the rule-making process.

This does not mean that tribal consent is required for restrictions on the exercise of the treaty rights. As the Supreme Court has stated on several occasions, the state's police power gives it adequate authority to regulate the exercise of the treaty-secured Indian off-reservation fishing rights, provided its regulations meet the standards which that court has prescribed.

It is not necessary at this time, and it would be inappropriate on this record, to determine the extent, if any, of the authority of the Federal Government or of the intervenor tribes to prescribe regulations that would govern Indians in the exercise of the treaty-secured fishing rights. It is sufficient to say that the state's authority to prescribe restrictions within the limitations imposed by the treaties and directly binding upon the Indians is not dependent upon assent of the tribes or of the Secretary of the Interior. But certainly agreements with the tribes or deference to tribal preference or regulation on specific aspects pertaining to the exercise of treaty fishing rights are means which the state may adopt in the exercise of its jurisdiction over such fishing rights. Both the state and the tribes should be encouraged to pursue such a cooperative approach. See Makah Indian Tribe v. Schoettler, supra.

Two other contentions of defendant can be disposed of very briefly. Defendant urges that the treaty provisions were in some manner altered or affected by Oregon's admission to the Union on an "equal footing" basis subsequent to the time the treaties were negotiated and signed and prior to the time they were ratified and became effective as the law of the land. There is no merit in this contention. Statehood does not deprive the Federal Government of the power to enter into treaties affecting fish and game within a state, especially migratory species. Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1924). Nor did subsequent statehood diminish the treaty-secured fishing right. Puyallup Tribe et al. v. Department of Game et al., supra; Holcomb v. Confederated Tribes of the Umatilla Indian Reservation, supra. Defendant also argues that the treaty provisions were modified or superseded by the subsequent congressional action approving the 1918 Columbia Interstate Compact. Nothing in the Compact (ORS 507.010) or in the Act of Congress consenting thereto (40 Stat. 515) impaired the Indian treaty right in any way. Menominee Tribe v. United States, 391 U.S. 404, 88 S.Ct. 1705, 20 L.Ed.2d 697 (1968); United States v. Payne, 264 U.S. 446, 44 S.Ct. 352, 68 L.Ed. 782 (1924); United States v. Lee Yen Tai, 185 U.S. 213, 22 S.Ct. 629, 46 L.Ed. 878 (1902); P. J. McGowan & Sons v. Van Winkle, D.C., 21 F.2d 76, aff'd 227 U.S. 574, 48 S.Ct. 435, 72 L.Ed. 995 (1928); Olin v. Kitzmiller, 9 Cir., 268 F. 348, aff'd 259 U.S. 260, 42 S.Ct. 510, 66 L.Ed. 930 (1922); Anthony v. Veatch, 189 Or. 462, 220 P.2d 493, appeal dismissed 340 U.S. 923, 71 S.Ct. 499, 95 L.Ed. 667 (1950); Union Fishermen's Co. v. Shoemaker, 98 Or. 569, 193 P. 476 (1921); State v. James, 72 Wash.2d 746, 435 P.2d 521 (1967); State ex rel. Gile v. Huse, 183 Wash. 560, 561, 49 P.2d 25 (1935).

This opinion shall constitute findings of fact and conclusions of law in accordance with Rule 52(a) Fed.R.Civ.P.