# UNITED STATES *v.* LEE YEN TAI.

CERTIFICATE FROM THE CIRCUIT COURT OF APPEALS FOR THE SEC-
OND CIRCUIT.

# CHIN BAK KAN *v.* UNITED STATES.
# CHIN YING *v.* UNITED STATES.

APPEALS FROM THE DISTRICT COURT OF THE UNITED STATES FOR THE
NORTHERN DISTRICT OF NEW YORK.

Nos. 503, 525, 526. Argued March 13, 14, 1902.—Decided April 21, 1902.

In case statutes are alleged to be inconsistent with each other, effect must
be given to both, if by any reasonable interpretation, that can be done;
and like principles must control when the question is whether an act of
Congress has been superseded in whole or in part by a subsequent treaty
with a foreign nation.

THESE three cases were all argued together. The opinion of
the court is entitled only in No. 503, *United States* v. *Lee Yen
Tai.* The case is stated in that opinion of the court.

*Mr. Assistant Attorney General Hoyt* for the United States
in all the cases.

*Mr. B. Lewinson* and *Mr. Max J. Kohler* for the appellees
in No. 503, and for the appellants in Nos. 525 and 526.

MR. JUSTICE HARLAN delivered the opinion of the court.

This case is here upon a certified question of law arising in
the Circuit Court of Appeals for the Second Circuit.

The facts out of which the question arose and the question
itself are shown by the following statement sent up by that
court:

" On the 8th day of October, 1900, complaint was made un-

der oath before a commissioner of the United States for the Northern District of New York, charging that Lee Gin Moy, *alias* Lee Yen Tai, on the sixth day of October, A. D. 1900, 'did unlawfully come into the United States from China, he being then and there a Chinese person and laborer, and not being a diplomatic or other officer of the Chinese or any other Government, and without producing the certificate required of Chinese persons seeking to enter the United States, and that he was not entitled to be or remain within the United States.' A warrant for said defendant's arrest was issued by said United States commissioner on the same day, and after a hearing before said commissioner he issued a warrant of deportation in which the following adjudication was placed on record :

"'I now hereby find and adjudge that the said Lee Gin Moy is a Chinese person and laborer ; that he is not a diplomatic or other officer of the Chinese, or of any other Government, and unlawfully entered the United States as charged in said complaint ; and I further adjudge him, said Lee Gin Moy, guilty of not being lawfully entitled to be or remain in the United States.'

"Said defendant's immediate removal to China by the United States marshal for said Northern District of New York upon said warrant was ordered by said commissioner. While the marshal had him in custody, and in process of deportation, *habeas corpus* was issued by the District Court for the Southern District of New York. The petition upon which the writ of *habeas corpus* issued averred, among other things, that said Lee Yen Tai was a merchant having an interest of one thousand dollars ($1000) in the capital of the firm, and is not a laborer, and has not been a laborer, but is a merchant and member of a firm specified in the petition, and has always been a merchant since he had any status.

"Before the District Court the prisoner was produced, and a return made which included the aforesaid warrant of deportation ; said return was traversed and no evidence as to defendant's status other than the allegations in the aforesaid petition and return was before the District Court. Upon the hearing in the District Court the petitioner was discharged upon giving

bail for his appearance as may be determined by any final order on appeal. Appeal was duly taken by the United States to this court."

By the preamble of the act of May 6, 1882, c. 126, it was declared that in the opinion of the Government of the United States the coming of Chinese laborers to this country endangered the good order of certain localities within our territory. It was therefore provided that from and after the expiration of ninety days from the above date, and until the expiration of ten years from such date, the coming of Chinese laborers to the United States should be suspended, and during such suspension it was made unlawful for any Chinese laborer to come, or having come after the expiration of said ninety days, to remain within the United States. § 1. Penalties were imposed upon the master of any vessel who should knowingly bring within the United States on his vessel and land or permit to be landed any Chinese laborer from any foreign port or place. § 2. In order to identify such Chinese as were entitled, under the treaty of November 17, 1880, 22 Stat. 826, to go from and come to the United States of their free will and accord, provision was made for certificates to be granted to such persons. § 4.

The twelfth section of the above act was as follows:

"That no Chinese person shall be permitted to enter the United States by land without producing to the proper officer of customs the certificate in this act required of Chinese persons seeking to land from a vessel. And any Chinese person found unlawfully within the United States shall be caused to remove therefrom to the country from whence he came, by direction of the President of the United States, and at the cost of the United States, after being brought before some justice, judge or commissioner of a court of the United States and found to be one not lawfully entitled to be or remain in the United States." 22 Stat. 58, 61.

By the act of July 5, 1884, c. 220, the twelfth section of the above act of May 6, 1882, was amended so as to read as follows:

"That no Chinese person shall be permitted to enter the United States by land without producing to the proper officer of customs the certificate in this act required of Chinese persons

seeking to land from a vessel. And any Chinese person found unlawfully within the United States shall be caused to be removed therefrom to the country from whence he came, and at the cost of the United States, after being brought before some justice, judge or commissioner of a court of the United States and found to be one not lawfully entitled to be or to remain in the United States; and in all such cases the person who brought or aided in bringing such person to the United States shall be liable to the Government of the United States for all necessary expenses incurred in such investigation and removal; and all peace officers of the several States and Territories of the United States are hereby invested with the same authority as a marshal or United States marshal in reference to carrying out the provisions of this act or the act of which this is amendatory, as a marshal or deputy marshal of the United States, and shall be entitled to like compensation to be audited and paid by the same officers. And the United States shall pay all costs and charges for the maintenance and return of any Chinese person having the certificate prescribed by law as entitling such Chinese person to come into the United States who may not have been permitted to land from any vessel by reason of the provisions of this act." 23 Stat. 115, 117, 118.

Subsequently, by the act of May 5, 1892, c. 60, entitled "An act to prohibit the coming of Chinese persons into the United States," it was provided that "all laws now [then] in force prohibiting and regulating the coming into this country of Chinese persons and persons of Chinese descent are hereby continued in force for a period of ten years from the passage of this [that] act." 27 Stat. 25, § 1.

The question certified to us is whether the twelfth section of the act of 1882, amended and continued in force as above stated, was abrogated by the treaty with China proclaimed December 8, 1894. 28 Stat. 1210.

As this question cannot be properly disposed of without examining the entire treaty, the provisions of the treaty are here given in full:

"Whereas, on the 17th day of November, A. D. 1880, and of Kwanghsii the sixth year, tenth moon, fifteenth day, a treaty

was concluded between the United States and China, for the purpose of regulating, limiting or suspending the coming of Chinese laborers to, and their residence in, the United States;

"And whereas the Government of China, in view of the antagonism and much deprecated and serious disorders to which the presence of Chinese laborers has given rise in certain parts of the United States, desires to prohibit the emigration of such laborers from China to the United States;

"And whereas the two Governments desire to coöperate in prohibiting such emigration, and to strengthen in other ways the bonds of friendship between the two countries;

"And whereas the two Governments are desirous of adopting reciprocal measures for the better protection of the citizens or subjects of each within the jurisdiction of the other;

"Now, therefore, etc.   .   .   .

"ART. I. The high contracting parties agree that for a period of ten years, beginning with the date of the exchange of the ratifications of this convention, the coming, except under the conditions hereinafter specified, of Chinese laborers to the United States shall be absolutely prohibited.

"ART. II. The preceding article shall not apply to the return to the United States of any registered Chinese laborer who has a lawful wife, child or parent in the United States, or property therein of the value of one thousand dollars, or debts of like amount due him and pending settlement. Nevertheless, every such Chinese laborer shall, before leaving the United States, deposit, as a condition of his return, with the collector of customs of the district from which he departs, a full description in writing of his family, or property, or debts, as aforesaid, and shall be furnished by said collector with such certificate of his right to return under this treaty as the laws of the United States may now or hereafter prescribe and not inconsistent with the provisions of this treaty; and should the written description aforesaid be proved to be false, the right of return thereunder, or of continued residence after return, shall in each case be forfeited. And such right of return to the United States shall be exercised within one year from the date of leaving the United States; but such right of return to the United States

may be extended for an additional period, not to exceed one year, in cases where by reason of sickness or other cause of disability beyond his control, such Chinese laborer shall be rendered unable sooner to return—which facts shall be fully reported to the Chinese consul at the port of departure, and by him certified, to the satisfaction of the collector of the port at which such Chinese subject shall land in the United States. And no such Chinese laborer shall be permitted to enter the United States by land or sea without producing to the proper officer of the customs the return certificate herein required.

" ART. III. The provisions of this Convention shall not affect the right at present enjoyed of Chinese subjects, being officials, teachers, students, merchants or travelers for curiosity or pleasure, but not laborers, of coming to the United States and residing therein. To entitle such Chinese subjects as are above described to admission into the United States, they may produce a certificate from their government or the government where they last resided viséd by the diplomatic or consular representative of the United States in the country or port whence they depart.

" It is also agreed that Chinese laborers shall continue to enjoy the privilege of transit across the territory of the United States in the course of their journey to or from other countries, subject to such regulations by the Government of the United States as may be necessary to prevent said privilege of transit from being abused.

" ART. IV. In pursuance of Article III of the Immigration Treaty between the United States and China, signed at Peking on the 17th day of November, 1880, (the 15th day of the tenth month of Kwanghsii, sixth year,) it is hereby understood and agreed that Chinese laborers or Chinese of any other class, either permanently or temporarily residing in the United States, shall have for the protection of their persons and property all the rights that are given by the laws of the United States to citizens of the most favored nation, excepting the right to become naturalized citizens. And the Government of the United States reaffirms its obligation, as stated in said Ar-

ticle III, to exert all its power to secure protection to the persons and property of all Chinese subjects in the United States.

" Art. V. The Government of the United States, having by an act of Congress, approved May 5th, 1892, as amended by an act approved November 3d, 1893, required all Chinese laborers lawfully within the limits of the United States before the passage of the first named act to be registered as in said act provided, with a view of affording them better protection, the Chinese Government will not object to the enforcement of such acts, and reciprocally the Government of the United States recognizes the right of the Government of China to enact and enforce similar laws or regulations for the registration, free of charge, of all laborers, skilled or unskilled, (not merchants as defined by said act of Congress,) citizens of the United States in China, whether residing within or without the treaty ports. And the Government of the United States agrees that within twelve months from the date of the exchange of the ratifications of this convention, and annually, thereafter, it will furnish to the Government of China registers or reports showing the full name, age, occupation and number or place of residence of all other citizens of the United States, including missionaries, residing both within and without the treaty ports of China, not including, however, diplomatic and other officers of the United States residing or traveling in China upon official business, together with their body and household servants.

" Art. VI. This Convention shall remain in force for a period of ten years beginning with the date of the exchange of ratifications, and, if six months before the expiration of the said period of ten years, neither Government shall have formally given notice of its final termination to the other, it shall remain in full force for another like period of ten years." 28 Stat. 1210.

The first proposition made on behalf of the defendant is that the treaty of 1894 should be construed as covering the whole subject of Chinese exclusion, and that its failure to prescribe any judicial procedure for deportation, or to continue in force any prior statute on that subject, shows that the Commissioner was without jurisdiction.

If the words of the treaty of 1894, reasonably interpreted, indicate a purpose to cover the whole subject of Chinese exclusion—including the methods to be employed to effect that result—then the proceedings against the defendant before the Commissioner were without authority of law; for the treaty itself does not provide any particular method by which Chinese laborers may be prevented from entering the United States, or for sending them out of the country if they illegally enter, although both nations expressed in the treaty a desire to coöperate in preventing the immigration or coming to this country of such persons. China itself recognized it to be its duty to coöperate with the United States to that end, " in view of the antagonism and much deprecated and serious disorders to which the presence of Chinese laborers has given rise in certain parts of the United States." As both countries were agreed that this result should be attained, the court ought to hesitate to adopt any construction of the treaty that would tend to defeat the object each had in view. We must assume that the two Governments knew that a general prohibition of the coming of Chinese laborers to the United States would be ineffectual if no provision were made for determining whether a particular Chinaman seeking to enter the country, and whose right to enter was denied, belonged to the class prohibited from coming within our territorial limits.

It is not disputed that such provision exists if section 12 of the act of May 6, 1882, as amended by the act of July 5, 1884, and as continued in force by the act of May 5, 1892, be held not to have been repealed or superseded by the treaty of 1894.

That it was competent for the two countries by treaty to have superseded a prior act of Congress on the same subject is not to be doubted; for otherwise the declaration in the Constitution that a treaty, concluded in the mode prescribed by that instrument, shall be the supreme law of the land, would not have due effect. As Congress may by statute abrogate, so far at least as this country is concerned, a treaty previously made by the United States with another nation, so the United States may by treaty supersede a prior act of Congress on the same subject: In *Foster & Elam* v. *Neilson*, 2 Pet. 253, 314, it was

said that a treaty was "to be regarded in courts of justice as equivalent to an act of the legislature, whenever it operates of itself without the aid of any legislative provision." In the case of *The Cherokee Tobacco*, 11 Wall. 616, 621, this court said "a treaty may supersede a prior act of Congress, and an act of Congress may supersede a prior treaty." So in the *Head Money Cases*, 112 U. S. 580, 599, this court said : "So far as a treaty made by the United States with any foreign nation can become the subject of judicial cognizance in the courts of this country, it is subject to such acts as Congress may pass for its enforcement, modification or repeal." Again, in *Whitney* v. *Robertson*, 124 U. S. 190, 194: "By the Constitution a treaty is placed on the same footing, and made of like obligation, with an act of legislation. Both are declared by that instrument to be the supreme law of the land, and no superior efficacy is given to either over the other. When the two relate to the same subject, the courts will always endeavor to construe them so as to give effect to both, if that can be done without violating the language of either; but if the two are inconsistent, the one last in date will control the other, provided always that the stipulation of the treaty on the subject is self-executing." See also *Taylor* v. *Morton*, 2 Curtis, 454, 459; *Clinton Bridge Case*, 1 Woolworth, 155; *Ropes* v. *Church*, 8 Blatchf. 304; 2 Story on Const., § 1838. Nevertheless, the purpose by statute to abrogate a treaty or any designated part of a treaty, or the purpose by treaty to supersede the whole or a part of an act of Congress, must not be lightly assumed, but must appear clearly and distinctly from the words used in the statute or in the treaty.

In the case of statutes alleged to be inconsistent with each other in whole or in part, the rule is well established that effect must be given to both, if by any reasonable interpretation that can be done; that "there must be a positive repugnancy between the provisions of the new laws and those of the old ; and even then the old law is repealed by implication only *pro tanto*, to the extent of the repugnancy;" and that "if harmony is impossible, and only in that event, the former is repealed in part or wholly, as the case may be." *Wood* v. *United States*, 16 Pet.

342, 363; *United States* v. *Tynen*, 11 Wall. 88, 93; *State* v. *Stoll*, 17 Wall. 425, 431.   In *Frost* v. *Wenie*, 157 U. S. 46, 58, this court said: "It is well settled that repeals by implication are not to be favored.   And when two statutes cover, in whole or in part, the same matter, and are not absolutely irreconcilable, the duty of the court—no purpose to repeal being clearly expressed or indicated—is, if possible, to give effect to both.   In other words, it must not be supposed that the legislature intended by a later statute to repeal a prior one on the same subject, unless the last statute is so broad in its terms and so clear and explicit in its words as to show that it was intended to cover the whole subject, and, therefore, to displace the prior statute."

The same rules have been applied where the claim was that an act of Congress had abrogated some of the provisions of a prior treaty between the United States and China.   *Chew Heong* v. *United States*, 112 U. S. 536, 550.   In that case it was held that the treaty could stand with the subsequent statutes, and, consequently, it was enforced.

Like principles must control when the question is whether an act of Congress has been superseded in whole or in part by a subsequent treaty.   A statute enacted by Congress expresses the will of the people of the United States in the most solemn form.   If not repugnant to the Constitution, it is made by that instrument a part of the supreme law of the land, and should never be held to be displaced by a treaty, subsequently concluded, unless it is impossible for both to stand together and be enforced.   So far from there being any inconsistency between the statute and treaty here in question, the twelfth section of the act of 1882, as amended in 1884 and continued in force for ten years from and after the passage of the act of 1892, is in absolute harmony with the treaty and can be enforced without affecting or impairing any right secured by the treaty.   On the contrary, the enforcement of that section as amended will serve to advance the purpose of the two countries in respect of Chinese laborers, as avowed in the treaty of 1894.   Despite the ingenious argument to the contrary, we do not perceive any difficulty whatever in reaching this conclusion, after carefully

scrutinizing the treaty and the statute. A different conclusion would be hostile to the objects which, as avowed in the treaty, both the United States and China desired to accomplish. This is so clearly manifest that argument cannot, as we think, make it more so.

> *The question certified is answered in the negative, and an order so declaring will be sent to the Circuit Court of Appeals.*

MR. JUSTICE GRAY did not hear the argument and took no part in the decision.