497 P.2d 1386

STATE of Idaho, Plaintiff-Appellant,

v.

Gerald Cleo TINNO, Defendant-Respondent.

No. 10737.

Supreme Court of Idaho.

June 8, 1972.

W. Anthony Park, Atty. Gen., and T. J. Jones, III, of Jones & Jones, Boise, Special Counsel for Idaho Fish and Game Department, for plaintiff-appellant.

Louis F. Racine, Jr., Racine, Huntley, Herzog & Olson, Pocatello, for defendant-respondent.

Joseph L. Coniff, Asst. Atty. Gen., of the State of Washington, for Washington State Dept. of Game, Olympia, Wash., Robert S. Lynch, Dept. of Justice, Washington, D. C., and Sidney E. Smith, U. S. Atty., Boise, for the United States of America, amici curiae.

McFADDEN, Justice.

Defendant-respondent Gerald Cleo Tinno, a duly enrolled member of the Shoshone-Bannock Tribes of Indians, resides on the Fort Hall Indian Reservation located near Pocatello. He was charged by a complaint with taking a chinook salmon with a spear from the Yankee Fork of the Salmon River in Custer County on July 16, 1968. Both spear fishing and taking salmon at that particular time and location were violations of state fishing regulations.

Trial of the charges was held before a justice of the peace. Respondent admitted the actions charged but as a defense alleged a superior federal right exempting him from the state fishing regulations based on the Treaty with the Eastern Band Shoshone and Bannock, of July 3, 1868, 15 Stat. 673 (hereinafter referred to as the Fort Bridger Treaty). Respondent was adjudged guilty and he appealed to the district court for a trial de novo.

At the non-jury trial in the district court, the parties entered into a stipulation of facts, accepted by the court, in which respondent admitted the acts complained of and in which the parties agreed that respondent is a member of the Indian tribe which is successor to the tribes signatory to the Fort Bridger Treaty. The prosecution offered exhibits A–O which were admitted, these exhibits consisting of copies of treaties, orders and agreements relating to the history of negotiations between the Shoshone and Bannock Tribes and the United States. The State then rested. Thereupon respondent moved for dismissal contending the exhibits established that he had a paramount right to fish in the manner and at the time and place set forth in the complaint. The motion was denied and respondent proceeded to call nine witnesses and to produce defendant's exhibit 1, extracts of certain Fort Hall Reservation historical records.

After hearing the testimony and considering the documentary evidence the district court found that respondent was exempted by treaty right from the regulations in question and, therefore, was not guilty of the crime charged. This finding appears in the memorandum decision filed by the

district judge which is treated as the judgment of the court. The State appeals from the judgment.

The initial issue determinative of the appeal for these parties concerns the application and effect of I.C. §§ 19–2801 [1] and 19–2804.[2] These provisions and others govern the jurisdiction of this Court in appeals from criminal proceedings in the district courts. State v. Grady, 31 Idaho 272, 170 P. 85 (1918); State v. Anderson, 83 Idaho 263, 361 P.2d 787 (1961).

▆ In this appeal respondent has not raised any issue concerning the State's right to appeal from a judgment in favor of a defendant in a criminal prosecution. No motion for dismissal has been filed. However, the question of this Court's jurisdiction to hear the matter was raised by brief and in oral argument by counsel for the United States. The question of jurisdiction, of course, is fundamental, and cannot be ignored once called to our attention.

▆ We are constrained by I.C. § 19–2804 to hold that the appeal must be dismissed. In State v. Albertson, 93 Idaho 640, 470 P.2d 300 (1970), this Court faced a procedural record somewhat similar to that present before us here. In that case the parties had stipulated in the district court that defendant had done the acts complained of (failure to wear a safety helmet while operating a motorcycle) and further, defendant waived any trial. The only question for the district judge was the constitutionality of the statute. The State appealed from an adverse ruling and this Court of its own accord decided to treat the appeal "as being in effect an appeal by the State from a judgment for a criminal defendant

on a demurrer to an information. I.C. § 19–2804 [1]."

The instant case also involved an admission by defendant of the acts alleged. However, this cause was essentially tried, at least insofar as the defense is concerned, with documentary and testimonial evidence being considered. All issues of fact were not resolved by the stipulation between the parties. To view the record differently would be to ignore the plain import of the proceedings and to distort the statute beyond recognition. The following rule set forth in State v. Grady, *supra*, applies:

" 'As a general rule the state has no right to a writ of error or to an appeal from a judgment in favor of defendant, whether upon a verdict of acquittal or upon the determination by the court of a question of law, unless it be expressly conferred by statute in the plainest and most unequivocal terms' [citations]." 31 Idaho at 274, 275, 170 P. at 86.

▆ We are, of course, aware of the importance attached to this appeal and recognize the considerable effort of all parties spent in fully briefing the substantive issues in this appeal. We recognize, too, the uniqueness of the record established in this case. The relentless passage of time dims human memory; it removes knowledgeable witnesses who could best describe the historical facts necessary to an informed decision. It is reasonable to assume the dispute between the State and the Shoshone-Bannock treaty Indians over fishing regulations will be repeated so that eventually the matter must be resolved. These factors lead us to consider the matter substantively for the benefit of not only the

---

1. I.C. § 19–2801. "Who may appeal.— Either party in a criminal action in the district court may appeal to the Supreme Court, on questions of law alone, as prescribed in this chapter."

2. I.C. § 19–2804. "Appeal by state.—An appeal may be taken by the state:
   1. From a judgment for the defendant on a demurrer to the indictment or information.

2. From an order granting a new trial.
   3. From an order arresting judgment.
   4. From an order made after judgment affecting the substantial rights of the prosecution.
   5. From any ruling of the trial judge during the course of the trial on the receipt or rejection of testimony, and from any ruling of the trial judge on the giving or refusal to give instructions to the jury."

State but also the members of the various Indian tribes.

This appeal encompasses several important issues relating to the effect of the Fort Bridger Treaty on Indian fishing right claims.[3]

The issue which logically must be resolved first is whether the treaty provides for any fishing rights to remain with the Indians. The relevant treaty provision reads:

"Article 4. The Indians herein named agree, when the agency house and other buildings shall be constructed on their reservations named, they will make said reservations their permanent home, and they will make no permanent settlement elsewhere; but they shall have *the right to hunt* on the *unoccupied lands of the United States* so long as game may be found thereon, and so long as peace subsists among the whites and Indians on the borders of the *hunting districts.*" (Emphasis added.)

Nowhere in this quoted section or in other parts of the treaty does one find reference to the term "fish" or "fishing." On this point the district court had the benefit of the expert testimony of Dr. Sven S. Liljeblad, a professor of anthropology and linguistics at Idaho State University, relating to the term "to hunt" as the term was generically used in the languages of the signatory Indians. According to his testimony the particular Indian languages did not employ separate verbs to distinguish between hunting and fishing but rather used a general term for hunting and coupled this with the noun corresponding to the object (either animal or vegetable) sought. The Shoshone verb was "tygi" while the corresponding Bannock term was "hoawai"; both were defined as meaning "to obtain wild food." As Dr. Liljeblad explained, the English terminology when translated to those Indian leaders at the treaty negotiations would have been understood to encompass both "fishing" and "hunting" for game.

The State offered exhibit B, the notes of Brevet Major-General C. C. Augur, an Indian Peace Commissioner who negotiated the Fort Bridger Treaty. In those notes General Augur does state that the subject of "hunting and fishing" was discussed during the negotiations. Those notes reflect the true concern of the tribal negotiators, recognized by the government agents, that the signatory Indians were facing a major change in their way of life and that their traditional food gathering would have to be insured in the future. The record also indicates that the Indians living on the Fort Hall Reservation, which was established pursuant to the Fort Bridger Treaty, entered into a subsequent agreement with the United States in 1898. 31 Stat. 672. That agreement related to the cession of certain Fort Hall Reservation lands to the United States. Article 4 of that agreement reads:

"So long as any of the lands ceded, granted, and relinquished under this treaty remain part of the public domain, Indians belonging to the above-mentioned tribes, and living on the reduced reservation, shall have the right, without any charge therefore, to cut timber for their own use, but not for sale, and to pasture their livestock on said public lands, and to hunt thereon and *to fish in the streams thereof.*" (Emphasis added.)

While this provision only relates to ceded reservation land, express mention of fishing rights does bear on the recognition of the off-reservation rights reserved in the earlier treaty. That is, it is significant that fishing is recognized as part of the Indian way of life even thirty years subsequent to the first treaty.

On this point the record shows that the Indians represented at the Fort Bridger negotiations were a rather diverse group in terms of geography and social or political

---

3. *See*, Burnett, "Indian Hunting, Fishing, and Trapping Rights—The record and the Controversy," 7 Idaho L.R. 49 (1970). Comment, "Regulation of Treaty Indian Fishing," 43 Wash.L.R. 670 (1968).

allegiance. The two anthropologists who testified at the trial, Dr. Liljeblad, mentioned earlier, and Dr. Earl H. Swanson, Jr., also a professor at Idaho State University, stated the various tribes or bands were in fact rather loosely knit units, and individual families freely changed their associations from one group to another; so called Shoshone Indians could and did join and live with Bannock bands and did intermarry. The two languages, though different, were not substantial hurdles to social mixing. Most people apparently were bilingual. The record also established that various bands of Shoshones and Bannocks roamed much of present day Southern Idaho which includes the Salmon River drainage. Annual treks to salmon spawning beds in the region which includes the Yankee Fork were part of the economic way of life of these Indians since earliest times. Testimony at the trial by several older members of the Fort Hall Reservation population established that salmon fishing continued to be a part of the subsistence plan of the Indians since the Fort Bridger Treaty.

■ These substantial facts indicate to us that Article 4 of the Fort Bridger Treaty should be read to include a fishing right. We endorse the construction applied by the district judge in his memorandum opinion:

"There is no plausible reason why a traditional and basic means of subsistence of the Indian, the taking of fish, would not have been intended to be reserved by the Indian, or was intended to be extinguished by acquisition by the United States, while at the same time the Indian reserved the right to hunt all other foods. Since the treaty, the Indians have continued to take fish in the manner and the places taught and shown them by their forefathers. The history of the Indians, the tenor of the treaty, and the understanding of the treaty by the parties, dictate that the words 'to hunt' be not so delimited as to exclude the right 'to fish.'"

This conclusion finds further support in our earlier decision in State v. McConville, 65 Idaho 46, 139 P.2d 485 (1943). *And see* State v. Gurnoe, 53 Wis.2d 390, 192 N.W.2d 892 (Wis.1972).

The next principal issue concerns the right of defendant or other treaty Indians to fish at the particular location on the Yankee Fork, a tributary of the Salmon River. The State contends that the answer to this question depends on whether the Yankee Fork lies within a region of land ceded to the United States in the Fort Bridger Treaty.

■■ The concept that the exercise of Indian treaty rights is limited to ceded lands appears in several prior cases. Tulee v. State of Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); State v. Arthur, 74 Idaho 251, 261 P.2d 135 (1953), cert. den., 347 U.S. 937, 74 S.Ct. 627, 98 L.Ed. 1087 (1953). New York ex rel. Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166 (1916); State v. Meninock, 115 Wash. 528, 197 P. 641 (Wash.1921); *cf.* State v. McConville, 65 Idaho 46, 139 P.2d 485 (1943). The theory is that the signatory Indians represented separate political states or sovereignties and as such held title or rights to definable areas of real estate through use, occupancy or possession. The common law concepts cf grants, conveyances, and "reservations" from grants became part of Indian treaty law although those terms were essentially foreign to Indian thinking. *See* United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905). As a result courts must interpret these treaties differently than ordinary conveyances, Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), keeping in mind the probable understanding of the Indians, Seufert Bros. Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1919).

The record in this case relating to the areas of land ceded to the United States by the Fort Bridger Treaty is meager. The treaty itself does not contain a description of the land given up or "ceded" by the Indians; rather, it merely sets out an area for a reservation for their use. The notes taken by the United States representative,

General Augur, which are by no stretch of imagination comprehensive, refer to vast areas of Idaho and surrounding states. The record establishes that certain groups of Indians then known as "sheepeaters" and "salmon eaters" were represented at the treaty signing. The anthropologists testifying explained that these particular Indians, who were either Shoshone or Bannock or a mixture of these peoples, roamed the Salmon River country, the Snake River country, and the length of what is now Southern Idaho.

This record points up the difficulty in trying to place a neat and technical geographical construction on these treaties. The signatory Indians had roamed at will and essentially in peace among themselves. They did not in a strict sense occupy the land they roamed; they harvested game, fish, and berries, camas roots, and other natural foods and moved about with the seasonal changes. In agreeing to settle on a permanent basis they still were expecting rights to harvest food on the unsettled lands as a means of subsistence and as an integral part of their way of life.

■ Article 4 of the Fort Bridger Treaty refers to the "unoccupied lands of the United States" and not to "ceded" lands. The parties stipulated that the Yankee Fork at the location where respondent fished lies within the Challis National Forest and is unoccupied land of the United States. A plain reading of the treaty provision would lead to the conclusion that there is no serious geographical question presented. However, the State urges a qualified reading of Article 4 to limit its application to ceded lands, and further maintains that the place where the offense occurred was outside ceded lands. At trial defendant Tinno answered the second element of the State's argument by showing that the Fort Bridger Indians made significant use of the Salmon River drainage area for their subsistence needs. The record specifically shows that the early Indians took salmon by spear at the spawning beds; likewise there is evidence that after the treaty signing Fort Hall Reservation Indians customarily hunted and fished in the region encompassing the Yankee Fork locale. It does, therefore, seem reasonable to conclude that in the framework of this case the locale is covered by the treaty.

■ Our conclusion, we believe, is based upon a reasonable, practical view of the record. The history of the treaty signing and the written records thereof do not lend themselves to a narrow interpretation in which we are urged to indulge. In order to be fair we must attempt to give effect to the terms of the treaty as those terms were understood by the Indian representatives. Choctaw Nation v. Oklahoma, *supra*, 397 U.S. at 631, 90 S.Ct. at 1334, 25 L.Ed.2d at 623; People v. Jondreau, 384 Mich. 539, 185 N.W.2d 375 (1971). State v. Gurnoe, *supra*.

We turn now to the remaining principal issue, that pertaining to the State's power to regulate Fort Hall Reservation Indians exercising off-reservation fishing rights under the Fort Bridger Treaty. The State sets forth a three-part argument. First, the State has an inherent sovereign right to regulate equally and non-discriminatorily the taking of fish by its citizens. Second, federal Indian treaties create no fishing rights immune from reasonable state regulation. Third, the statutes and regulations applicable were enacted for and do promote the purpose of conservation, and are presumed valid.

On the first and second points, the inherent right of states to regulate the taking of fish or other game by its citizens has long been recognized. Geer v. Connecticut, 161 U.S. 519, 16 S.Ct. 600, 40 L.Ed. 793 (1896). In regard to treaty Indians, there are numerous decisions holding that the state may also regulate Indians in their off-reservation exercise of treaty fishing rights if done so properly and if such regulation is reasonably necessary to preserve the fishery. Tulee v. State of Washington, *supra*; Puyallup Tribe v. Department of Game of Wash., 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968); State v. McCoy, 63 Wash.2d 421, 387 P.2d 942 (Wash.1963).

In State v. Arthur, *supra,* this Court strictly construed the State's power to regulate the exercise of rights protected by treaty. There the Court unanimously held that the state could not regulate a Nez Perce Indian exercising his hunting right on ceded lands under an 1855 treaty. The regulatory power was held to be in abeyance during the existence of the treaty. The Court noted that the treaty Indians usually do not hunt and fish for the reasons that motivate ordinary sportsmen:

> " * * * While both fishing and hunting are primarily sport and recreation for most fishermen and hunters, this is not so with respect to the Indians; they have always fished and hunted to obtain food and furs necessary for their existence and have been controlled as to the time when and the area where and the amount of catch or kill by the exigencies of the occasion * * *." 74 Idaho at 264, 261 P.2d at 142.

This Court recogized that treaty Indians have subsistence and cultural interests in hunting and fishing that are rooted more deeply than the recreational interests asserted by sportsmen. Sensitivity to this fact, coupled with a straightforward application of the "supremacy clause" of the Constitution, led the Court to conclude that the state could not infringe the defendant's exercise of treaty rights in that case.

State v. Arthur was a hunting rights case, arising from the taking of a deer from unoccupied lands outside the reservation by a Nez Perce tribesman. The Nez Perce Treaty of 1855 contained an unequivocal hunting right.[4] In contrast the fishing right was shared "in common with citizens of the Territory." Similar qualifications appeared in the fishing rights provisions construed by the Supreme Court of the United States in Tulee v. State of Washington, *supra,* and in Puyallup Tribe v. Department of Game of Wash., *supra.*[5] The Fort Bridger Treaty here at issue contains a unified hunting and fishing right which, like the hunting right discussed in State v. Arthur, is unequivocal.

The Supreme Court of the United States has not recently interpreted a treaty provision of this type.[6] Nevertheless, it is instructive to note that even in cases involving qualified fishing rights the Supreme Court has made clear that such rights are entitled to special protection. In *Tulee* the Supreme Court held that the state of Washington could not require a treaty Indian to purchase a fishing license, as required of non-Indians. The Court enunciated the general rule that no state regulation of the exercise of treaty fishing rights was permissible unless "necessary" to the preservation of the fishery. The Court essentially adhered to this rule in Puyallup Tribe v. Department of Game of Wash., even though the case had clear commercial overtones and arose from a continuing dispute between competing groups of *net* fishermen, Indian and non-Indian, exploiting the fishery for profit. An action to enjoin treaty Indian net fishing was remanded with instructions to limit the injunction sought and the Court affirmed that part of the Washington Supreme Court decision[7] using a

---

4. " 'Article III. * * * The exclusive right of taking fish in all the streams where running through or bordering said reservation is further secured to said Indians; as also the right of taking fish at all usual and accustomed places in common with citizens of the Territory; and of erecting temporary buildings for curing, together with the privilege of hunting, gathering roots and berries, and pasturing their horses and cattle upon and unclaimed land.' " 74 Idaho at 255, 261 P.2d at 136.

5. The same provision was interpreted in United States v. Winans, *supra,* and Seufert Bros. Co. v. United States, *supra.*

6. The Fort Bridger Treaty was at issue in Ward v. Race Horse, 163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896). In that case the state power to regulate treaty Indians' hunting was upheld on the theory that the enabling acts admitting western states to the Union superseded the earlier treaties. *Race Horse* and the theory it posited have been entirely discredited by the Supreme Court in *Winans* and *Tulee, supra,* and require no further discussion.

7. 70 Wash.2d 245, 422 P.2d 754 (1967).

"reasonable and necessary" criterion to measure the permissible extent of state regulation.

It would appear that if *qualified* treaty fishing rights receive this kind of special protection, even in the extreme context of commercial net fishing, the exercise of an unqualified treaty right to fish, by spearing a chinook salmon in the Yankee Fork River, certainly cannot be regulated by the state unless it clearly proves regulation of the treaty Indians' fishing in question to be necessary for preservation of the fishery. To require less of the state would emasculate the treaty rights and violate the "supremacy clause."

We are of the opinion that the special consideration which is to be accorded the Fort Bridger Treaty fishing right must focus on the historical reason for the treaty fishing right. The gathering of food from open lands and streams constituted both the means of economic subsistence and the foundation of a native culture. Reservation of the right to gather food in this fashion protected the Indians' right to maintain essential elements of their way of life, as a complement to the life defined by the permanent homes, allotted farm lands, compulsory education, technical assistance and pecuniary rewards offered in the treaty. Settlement of the west and the rise of industrial America have significantly circumscribed the opportunities of contemporary Indians to hunt and fish for subsistence and to maintain tribal traditions. But the mere passage of time has not eroded the rights guaranteed by a solemn treaty that both sides pledged on their honor to uphold. As part of its conservation program, the State must extend full recognition to these rights, and the purposes which underlie them.

This brings us to the third part of the State's argument. The State contends the fishing regulations violated were enacted to promote conservation purposes and are presumptively valid. It should be noted that the record before us is devoid of evidence relating to the salmon conservation problem. Respondent's evidence tends to show that the Fort Hall Indians who fish for salmon are not wasting their catch, but that the catch is used for purely domestic purposes. In contrast, the State, although having special knowledge and expertise, offered no justification or explanation of the regulation which it was in the position to do and which it is required to do. Puyallup Tribe v. Department of Game of Wash., *supra*, State v. James, 72 Wash.2d 746, 435 P.2d 521, 525 (1967); Department of Game v. Puyallup Tribe, Inc., 70 Wash.2d 245, 422 P.2d 754, 761 (Wash.1967), aff'd 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689; Maison v. Confederated Tribes of Umatilla Indian Res., 314 F.2d 169, 172 (9th Cir. 1963); Makah Indian Tribe v. Schoettler, 192 F.2d 224, 226 (9th Cir. 1951); Sohappy v. Smith, 302 F.Supp. 899, 910 (Or.1969); State v. Gurnoe, *supra*; *cf*. State v. Gowdy, 1 Or. App. 424, 462 P.2d 461, 465 (1969). Nor can the State merely rest on a presumption of validity where, as here the Indian has shown the regulation impinges upon a right provided for by an applicable federal Indian treaty. The treaty provision clearly will control against a conflicting state statutory enactment. State v. Arthur, *supra*. Further, this is not the typical situation where the state seeks to assert its general police power over a citizen. For the State to so regulate the treaty fishing right it must meet the federal standard "distinct from the federal constitutional standard concerning the scope of the police power of a State." Puyallup Tribe v. Department of Game of Wash., *supra*, 391 U.S. at 401, fn. 14, 88 S.Ct. at 1730, 20 L.Ed.2d at 695, 696.

The conservation statutes (I.C. §§ 36–103, 104) indicate the broad public policy, but the specific regulations promulgated thereunder must be shown to take proper account of the special and distinct nature of Indian treaty rights; and the regulatory provisions sought to be enforced must be specifically shown to be "reasonable and necessary" for preservation of the fishery. Department of Game v. Puyallup Tribe, Inc., *supra*, 422 P.2d at 764. The State has made no such showing.

The Puyallup Tribe cases, Sohappy v. Smith, 302 F.Supp. 899 (Dist.Or., 1969), and State v. Arthur, *supra*, all point towards some sort of rational, administrative settlement of these controversies. The State, which has special knowledge and statewide conservation powers, must come forward with justification for regulatory schemes affecting the Indians' fair share of the fishing harvest. Cooperation between conservation experts and the tribe in determining appropriate fish management programs is necessary if the treaty rights are to be observed.

In accordance with the views expressed herein, the appeal is dismissed.

DONALDSON, J., and MAYNARD, District Judge, concur.

McQUADE, Chief Justice (concurring specially).

The broad spectrum of issues addressed by the majority opinion necessarily has drawn the analysis rather thin. My purpose in filing this supplementary opinion is to make clear the thrust of the Court's decision on several critical points. When reduced to its essence, the State's argument in this case is: (1) the Fort Bridger Treaty does not contain a fishing right; (2) even if it does, the treaty does not protect fishing at the geographical location in question; and (3) in any event, off-reservation fishing by Indians under the treaty is fully subject to the same state regulations that apply to other citizens. The Court today decisively rejects each of these contentions.

I.

The State's assertion that the treaty does not guarantee a fishing right merits little additional discussion. The testimony of Dr. Liljeblad, the notes of General Augur and the Agreement of 1898, described in the majority opinion, clearly establish the existence of a treaty fishing right as an objective fact. Nevertheless, the State has suggested on appeal that, as a matter of law, the "grant" of a right by treaty should not be implied. The notion that Indian fishing rights were "granted" by the United States affronts common sense and conflicts with applicable holdings of the Supreme Court. The Indians were here before we were. The record in this case reveals that salmon was a staple in the diet of the Bannock and Shoshone for years prior to consummation of the treaty. The right to fish, unlike the right to occupy certain lands, never was extinguished by conquest.[1] The treaty did not *grant* a fishing right; rather, the Indians *reserved* a right they had always exercised.[2] The State's attempt to deny that right under the treaty, because of differences in translation between the English language and Indian dialects, casts a history-lengthened shadow of shame on this case. Indian treaties have been tainted with enough dishonor. This treaty must be interpreted as the Indian signatories understood it. "The language used in treaties with the Indians should never be construed to their prejudice."[3] The Fort Bridger Treaty contains a fishing right to which this Court extends full recognition.

1. On the significance of conquest in cases concerning land, *compare* Johnson v. McIntosh, 21 U.S. (8 Wheat.) 543, 5 L.Ed. 681 (1823), and Tee-Hit-Ton Indians v. United States, 348 U.S. 272, 75 S.Ct. 313, 99 L.Ed. 314 (1955), with United States, etc. v. Santa Fe & Pacific R.R., 314 U.S. 339, 62 S.Ct. 248, 86 L.Ed. 260 (1941). The "might makes right" doctrine underlying McIntosh and Tee-Hit-Ton is criticized in The Supreme Court, 1954 Term, 69 Harvard L.Rev. 119, 150 (1955).

2. Tulee v. State of Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115 (1942); United States v. Winans, 198 U.S. 371, 25 S.Ct. 662, 49 L.Ed. 1089 (1905).

3. Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 581, 8 L.Ed. 483 (1832). *Accord,* e. g., United States v. Kagama, 118 U.S. 375, 6 S.Ct. 1109, 30 L.Ed. 228 (1886); Seufert Bros. Co. v. United States, 249 U.S. 194, 39 S.Ct. 203, 63 L.Ed. 555 (1919); Choctaw Nation v. Oklahoma, 397 U.S. 620, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970).

## II.

The geographical scope of the fishing right is a phantom issue, deprived of substance by the plain language of the treaty itself. The fishing right may be exercised on any "unoccupied lands of the United States." Despite this express provision, the State argues that fishing is protected only within lands ceded by the Indians under the treaty. The defendant elected to meet this issue at trial by adducing historical evidence to prove that the tribes had frequented the Salmon River drainage area, so that if there were a ceded lands restriction, the fishing in question nevertheless would be protected. The district court properly treated that evidence as dispositive of the issue.

However, resolving the question on the facts affords no basis to infer that this Court accepts the ceded lands limitation in theory. To the contrary, nothing in the treaty itself supports such a limitation. The United States Supreme Court long ago discussed that point when it construed the Fort Bridger Treaty in Ward v. Race Horse.[4] The Court interpreted "all unoccupied lands of the United States" to include any federally controlled areas over which Congress had not yet granted state jurisdiction by passing an admission act superseding prior treaties. Subsequent demise of the superseding act theory[5] has removed the only limit the Supreme Court perceived in geographical application of the Fort Bridger Treaty.

Moreover, the record in this case indicates that the regions traversed by the tribes were not rigidly defined. They reflected the changing patterns of distribution and availability of game. As the majority opinion explains, the fishing right was reserved by treaty to protect a source of tribal subsistence and to preserve an integral part of the native American culture. These purposes can be given meaningful effect in 1972, when many fishing streams have been damned, depleted or polluted, only if the treaty is interpreted literally to extend to any unoccupied federal lands where fishing opportunities remain. A ceded lands restriction would be inconsistent with the language and spirit of the Fort Bridger Treaty.

## III.

The policy issues generated by the conflict between state regulations and Indian rights under a federal treaty occasionally obscure certain fundamental facts. The Fort Bridger Treaty is the "supreme law of the land" under Article VI, Section 2, of the United States Constitution.[6] The Organic Act of the Territory of Idaho, in effect when the treaty was signed and ratified in 1868, provided that Indian treaties should be "faithfully and rigidly observed."[7] When Idaho was admitted to the Union in 1890, Congress did not extinguish existing treaty rights; to the contrary, it provided that all applicable federal laws would continue in force and effect within the state.[8] In State v. Arthur[9] this Court, adhering to basic constitutional law and eschewing extraneous policy questions, held simply and clearly that

*Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.*" (Emphasis supplied)

---

4.  163 U.S. 504, 16 S.Ct. 1076, 41 L.Ed. 244 (1896).

5.  *See* Tulee v. State of Washington, and United States v. Winans, *supra* note 2. *Cf.* United States v. Lee Yen Tai, 185 U.S. 213, 22 S.Ct. 629, 46 L.Ed. 878 (1902) ; Cook v. United States, 288 U.S. 102, 53 S.Ct. 305, 77 L.Ed. 641 (1933) ; 7 Idaho L.Rev. 49, 59–61 (1970).

6.  U.S.Const., Art. VI, § 2 provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; *and all Treaties made, or which shall be made, under the*

7.  12 Stat. 808, ch. 117, § 17.

8.  26 Stat. 215, ch. 656, § 19.

9.  74 Idaho 251, 261 P.2d 135 (1953) ; cert. denied, 347 U.S. 937, 74 S.Ct. 627, 98 L. Ed. 1087 (1954) ; *accord,* People v. Jondreau, 384 Mich. 539, 185 N.W.2d 375 (1971).

"the statute of any state enacted pursuant to its police power which conflicts with any treaty of the United States constitutes an interference with matters that are within the exclusive scope of federal power and, hence cannot be permitted to stand * * *. [T]his in effect holds the application of the statute in abeyance during the existence of the treaty." [10]

The *Arthur* opinion further recognized that if the State were permitted to impose upon Indians the same regulations applicable to other citizens, then the treaty in reality would provide "no right at all." [11] To uphold the treaty fishing right while subjecting its exercise to the full scope of Fish and Game Department regulations would be a transparent hypocrisy.

In Puyallup Tribe v. Department of Game,[12] the United States Supreme Court recently described the police power of the State of Washington as "overriding" in a case where the Indians had engaged in commercial net fishing, indiscriminantly catching large quantities of spawning salmon and admittedly endangering the fishery.[13] The treaty in question provided only

the right to take fish "at all usual and accustomed places, in common with" citizens of Washington Territory.[14] The Court held that the manner and extent of such fishing could be regulated by the state if the controls were "appropriate," not discriminatory against the Indians in view of their upstream fishing locations, and were "necessary" to preserve the salmon run.[15] The Court supported this holding by carefully selecting precedents from its own prior decisions construing qualified, or shared, treaty fishing rights.[16] In contrast the case before us more closely resembles *Arthur*, where the treaty right was exclusive and its exercise was not contaminated by extensive commercial exploitation of the wildlife resource. Nothing in *Puyallup* requires deviation from *Arthur* in deciding this case.[17]

The thrust of the majority opinion can be fully grasped only when its language is understood to represent an acknowledgment of *Puyallup* while the Court adheres to *Arthur*. The meaning of this synthesis is best expressed in specific terms. The State may exercise its police power to prevent

10. 74 Idaho at 262, 261 P.2d at 141.

11. 74 Idaho at 264–265, 261 P.2d 135.

12. 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968).

13. *See* 391 U.S. at 402, note 15, 88 S.Ct. 1725.

14. Treaty of Medicine Creek, 10 Stat. 1132 (1854).

15. The appeal was remanded for findings on the necessity of state regulation. The Washington Supreme Court holding in *Puyallup*, that the state must *prove* the controls to be "reasonable and necessary," was affirmed. 70 Wash.2d 245, 422 P.2d 754 (1967). See also State v. James, 72 Wash.2d 746, 435 P.2d 521 (1967); Maison v. Confederated Tribes of the Umatilla Reservation, 314 F.2d 169 (9th Cir. 1963); State v. Gurnoe, 53 Wis.2d 390, 192 N.W.2d 892 (1972). In his separate opinion on this case, Justice Shepard protests imposition of this burden on the state; but if the burden were otherwise assigned, the Indians would be entitled to exercise their federal treaty right only when they could prove conflicting state regulations to be unnecessary to the state

conservation program. This is entirely inconsistent with the prior constitutional status of the federal treaty right as the "supreme law of the land." Moreover, as the majority notes in a practical sense, it is the State, not the Indian defendant, which has the resources and expertise to supply the relevant conservation data.

16. Tulee v. State of Washington, and United States v. Winans, *supra* note 2; Kennedy v. Becker, 241 U.S. 556, 36 S.Ct. 705, 60 L.Ed. 1166 (1916).

17. It has been suggested (*see* State v. Gurnoe, *supra* note 15) that the Supreme Court decision in Organized Village of Kake v. Egan, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962), recognized state power to invade an exclusive fishing right. However, as Justice Frankfurter plainly indicated in the opinion of the Court, the Indian claim to a fishing right in that case was not based on federal law. Rather, it was asserted as an extension of aboriginal occupancy rights. Consequently, the conflict between state regulations and a federal right, which forms the heart of the present case and of State v. Arthur, was not at issue in *Kake*.

destruction of the fishery. Such regulation does not conflict with the treaty fishing right; for in reality no such right exists if there are no fish. However, the purposes underlying the treaty right, to protect a traditional source of tribal subsistence and to preserve an important element in the Indian way of life, are not otherwise subject to state interference. To fulfill these purposes the Fort Bridger Treaty affords members of the Shoshone-Bannock tribes *first priority* to fish in streams on "unoccupied lands of the United States." That priority cannot be compromised, directly or indirectly, by restricting Indian fishing in order to maintain the fishery for other users. The treaty fishing right may not be infringed to provide fish for non-Indian sporting or commercial interests. These interests are honest and legitimate; but as a matter of law, they cannot intrude on a right guaranteed by federal treaty. The Indians' right to a share of the fish commensurate with the enunciated purposes of the Fort Bridger Treaty is absolute.[18]

In State v. Arthur this Court noted that the quantity of wildlife required to satisfy the treaty right should be established through "appropriate negotiations,"[19] subject to judicial review if required to protect the Indians' treaty right. Such negotiations should be structured to permit full and fair tribal participation.[20] Furthermore, the federal government, as a party to the Fort Bridger Treaty, is obliged to protect the rights secured thereunder by assisting the tribes in the course of negotiations. Occasional dispatch of a representative from the Department of Justice, or Department of the Interior, to argue the Indian cause once litigation has commenced, is not sufficient to discharge the special duty owed to a maltreated people threatened with further attenuation of their federal rights. Indeed, public officials at all levels of government would do well to reflect on the enduring importance of treaty rights in twentieth-century America:

"As to special Indian rights, since being an Indian is hereditary, the rights at first glance seem anomalous in a democracy; when we study them, however, the anomaly fades. They are part of a *quid pro quo* promised solemnly by use in treaties, agreements and laws, and upheld over and again by our courts, in exchange for the whole area of the United States and for the ending of rightful independence."[21]

SHEPARD, Justice (concurring in part and dissenting in part).

I concur in all of the majority opinion except the latter part thereof wherein the majority opinion makes the fishing regulation inapplicable to Indians. That regulation prohibited the taking of salmon from the spawning beds in the upper reaches of the Yankee Fork of the Salmon River. The majority opinion argues that the state should have offered a justification or explanation of the regulation. Numerous cases are cited for that proposition. I do not believe those cases are controlling in the case at bar.

The late case of Puyallup Tribe v. Department of Game of Washington, 391 U.S. 392, 88 S.Ct. 1725, 20 L.Ed.2d 689 (1968) affirmed the ability of the state to regulate fishing consistent with the interests of conservation although the Indian Tribe therein had been granted a Treaty right to fish at all "usual and accustomed places." In that case the state had prohibited the netting of fish at the mouths of fresh water streams. The reason stated therefor by the Court was that the salmon are milling and delaying, and especially in times of low water or early arrival of the run or for any number of reasons the delay may be considerable. The entire run is funneled into a small area and is very vulnerable. The

18. *See* the parallel discussion in Sohappy v. Smith, 302 F.Supp. 899 (D.Or.1969).

19. 74 Idaho, at 265, 261 P.2d 135.

20. Sohappy v. Smith, *supra* note 18, 302 F.Supp., at 911–912.

21. LaFarge, Termination of Federal Supervision, 311 Annals 41–42 (1957).

court in *Puyallup* left unanswered the question whether the prohibition of the use of set nets in fresh waters was a reasonable and necessary conservation measure.

In Tulee v. Washington, 315 U.S. 681, 62 S.Ct. 862, 86 L.Ed. 1115, the defendant was convicted only of failure to obtain a fishing license. Therein the court held that there was no necessary relation between conservation and the ability of the state to require an Indian, otherwise privileged to fish because of Treaty rights, to pay a fishing license fee. The court therein said:

"We think the state's construction of the treaty is too narrow and the appellant's too broad; that while the treaty leaves the state wth power to impose on Indians equally with others such restrictions of a purely regulatory nature concerning the time and manner of fishing outside the reservation as are necessary for the conservation of fish, it forecloses the state from charging the Indians a fee of the kind in question here."

In Sohappy v. Smith, 302 F.Supp. 899 (1969) it is stated:

"It is clear that the state has the full and complete power to regulate all kinds of fishing, including the Indian fishery, to the end that the resource is preserved."

In Maison v. Confederated Tribes of Umatilla Indian Reservation, 314 F.2d 169 (1963) the life cycle of the salmon and steelhead fish is explained. The court stated:

"In traveling upstream to spawn many debilitating hardships are encountered, including natural predators, disease and water pollution. By the time they reach the spawning ground, the body oils of the fish are practically used up, and they are often cut, bruised, diseased, and afflicted with fungus growths."

The court noted that fish on the spawning grounds have the highest value as seed stock but the lowest value for food. The court further stated:

"Thompson's testimony, to the effect that unrestricted fishing of sufficient industry could exhaust the spawning beds, is a proposition about which there can be no quarrel."

The court then went on to note, however, that the regulation contested therein which prohibited all fishing on tributaries of the Columbia and Snake Rivers during a certain part of the year did not reasonably relate to a protection of the spawning grounds.

I think this court may further take judicial notice of the laws of nature regarding the habits and life cycle of the anadromous fish. Such fish are spawned in the upper reaches of fresh water streams. They thereafter migrate downstream and spend the majority of their remaining life in the ocean. Just before death they return to the place where they were spawned and themselves carry out the spawning process wherein the eggs are deposited by the female and fertilized by the male. They thereafter do not return to the sea but die on or near their spawning grounds. Following spawning they rapidly deteriorate, becoming foul, diseased and much emaciated. *See*: Encyclopedia Britannica (1947 Ed.); The Encyclopedia Americana (1940 Ed.). Absent this spawning process, the migration of anadromous fish of a particular stream will cease.

I, therefore, in light of all of the above, disagree with the position of the majority opinion that state fishing regulations prohibiting the taking of fish on the spawning beds is void when applied to an Indian in the absence of "justification" or explanation." I believe that the need and policy enunciated by our statutes toward the preservation of our fishery resource is clearly carried out by the regulation questioned herein. While I agree that because of Treaty rights certain Indians possess broader authority to take fish and game than do non-Indians, nevertheless as enunciated by the United States Supreme Court the state possesses authority to regulate its fish and game resources for the purpose of reasonable conservation of that resource to the end that those who follow after us may

similarly enjoy those resources. The facts enunciated in this case and a desirable conservation policy clearly demonstrate to me the error contained in the latter part of the majority opinion.

In my judgment, allowing the unrestricted taking of salmon at the spawning beds will tend to eliminate the species. Such a result is harmful to all, Indian and non-Indian. As above stated the fish at that time are highly necessary for seed but of the poorest food value. The fact that they will die in any event does not change the absolute necessity of their spawning during their last days of life if the species is to be continued.